**ARTHUR J. SCHMITT FOUNDATION**
and Morris Bean & Company,
Plaintiffs,

v.

**STOCKHAM VALVES AND FITTINGS,**
INC., Defendant.

Civ. A. No. 63–383.

United States District Court
N. D. Alabama, S. D.

Oct. 28, 1966.

Leigh M. Clark, of Cabaniss, Johnston, Gardner & Clark, Birmingham, Ala., Truman S. Safford, William C. Conner and John A. Mitchell of Curtis, Morris & Safford, New York City, and James M. Parker of Gary, Parker, Juettner, Pigott & Cullinan, Chicago, Ill., for plaintiffs.

Douglas Arant of Bradley, Arant, Rose & White, Birmingham, Ala., and Thomas F. Reddy, Jr., S. Leslie Misrock, Robert J. Kadel and Sidney R. Bresnick of Pennie, Edmonds, Morton, Taylor & Adams, New York City, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GROOMS, District Judge.

This action was submitted for decision after thirty-one days of testimony. Upon such testimony, the exhibits, oral arguments and briefs; and the Court being fully advised, enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52.

## FINDINGS OF FACT

1. This is an action brought under the patent laws of the United States, U. S. Code, Title 35 and Title 28, Section 1400(b), and charges infringement of

four patents relating to resin-coated sand as used in the making of foundry molds for casting iron and other metals. The patents in suit are:

| Patent No. | Filing Date | Issue Date | Patentee | Subject |
|---|---|---|---|---|
| 2,991,267 | Apr. 10, 1957 | July 4, 1961 | X. L. Bean | Resin Coated Sand |
| 2,914,823 | Dec. 4, 1950 | Dec. 1, 1959 | X. L. Bean | Casting Mold |
| 2,706,188 | July 5, 1952 | Apr. 12, 1955 | C. W. Fitko & J. S. Horn | Partially Reacted Resin Coated Sand |
| 2,706,163 | June 5, 1953 | Apr. 12, 1955 | C. W. Fitko | Resin Coated Sand with Waxy Coating |

2. The December 4, 1950, application was a composite one covering a method of making foundry molds employing a distintegrable plaster pattern and a resin coated sand invention. The Patent Office required a division of the application, and a divisional application was filed August 16, 1956. A further division was required and on April 10, 1957, a continuation-in-part application was filed. Patent No. 2,836,867, not here in suit, covering a disintegrable plaster pattern was issued on the original application; No. 2,914,823 was issued on the divisional application, and No. 2,991,267 on the continuation-in-part application.

3. Plaintiff Morris Bean & Co. is an Ohio corporation engaged in the foundry business and having its principal office at Yellow Springs, Ohio. It is the owner of the Xarifa L. Bean patents Nos. 2,991,267 and 2,914,823 in suit.

4. Plaintiff Arthur J. Schmitt Foundation (hereinafter "Schmitt Foundation") is a non-profit Illinois corporation having its principal office in Chicago, Illinois. It is the owner of the Fitko et al. patent No. 2,706,188 and the Fitko patent No. 2,706,163 in suit.

5. Defendant Stockham Valves and Fittings, Inc. (hereinafter "Stockham") is a Delaware corporation engaged in the foundry business and having its principal office at Birmingham in the Northern District of Alabama, Southern Division.

6. Reichhold Chemicals, Inc., a Delaware corporation having its principal office at White Plains, New York, which supplies part of the specially formulated phenol formaldehyde resin used by Stockham in making its resin coated sand, has by and at its expense conducted the defense of this action, and has agreed to indemnify Stockham against patent infringement in such use of its resin.

7. Prior to World War II, the basic method of making molds for foundry castings involved the use of "green sand" containing sufficient clay and moisture to give it "green strength" or tackiness and cause it to retain the shape of a pattern against which it was pressed.

This green sand process involved considerable skilled labor and was therefore relatively expensive. The molds, with their enclosing flasks, were also heavy and unwieldy. The molds could not be stored for any substantial period of time, and had to be formed as they were needed.

8. Following the War, United States experts uncovered in occupied Germany a significant discovery known as the Croning or "C" process of making "shell" molds. This process involved mixing sand with about 6% to 8% by weight of dry, powdered phenol formaldehyde resin to form a free-flowing granular mixture which could be dumped onto a heated metal pattern and, without any pressure except that of gravity, would flow into conformity with the pattern contour. The heat of the pattern caused the resin first to melt and flow and ultimately to harden and thermoset to bind the sand grains together to form a rigid shell some $1/4$ inch or $3/8$ inch thick adjacent the pattern. Inverting the pat-

tern would allow the excess, unbonded mixture to fall back into the supply box for subsequent use.

Two of these shells were placed together to form a complete casting cavity. The shells were usually backed up with loose sand, steel shot or the like to support them against the pressure of the molten metal. The shells retained their strength long enough for the molten metal to solidify sufficiently to become self-supporting, after which the heat from the casting caused decomposition of the resin binder with resulting disintegration of the shells so that they would readily crumble away to free the casting.

The Croning process supplied a number of advantages over the green sand process, including improved dimensional accuracy and surface finish of the castings, susceptibility to production with unskilled labor or even automatic machinery, and light weight and storability of the shells. The process had a number of disadvantages including the following:

a. Due to the great difference in density of the sand and the powdered resin, handling of the mixture caused the resin to segregate from the sand and become unevenly distributed in the mixture. In areas of low resin concentration, the shells were apt to be weak, while elsewhere the resin might be so concentrated as to fill the spaces between the sand grains and destroy the permeability necessary to permit escape of the gases generated during casting. If these gases could not escape through the mold in the usual way, they tended to blow back into the molten metal causing "blow holes" in the surface of the casting.

b. The powdered resin "dusted" out of the mix, creating a fire and explosion hazard, as well as causing dermatitis in many persons of allergic susceptibility.

c. Much of the expensive resin was wasted.

d. The powdered resin-sand mix could not be handled or transported by many types of automatic machinery or conveyors, and could not be blown by air pressure into the heated core cavities of automatic core-making machinery, without causing separation of the resin from the sand. Thus, even after the Croning process went into commercial use for making shells, cores still had to be made by the old baked core process.

9. The Ford Motor Co., which started using the Croning process commercially about 1950 for the casting of valves and other automotive parts, recognized the aforementioned difficulties with process and experimented for a number of years in attempts to overcome these difficulties. Much of Ford's experimental work was in its attempt to prevent the segregation and dusting of the powdered resin by first wetting the sand grains with minor percentages of various wetting agents and adding the powdered resin in an attempt to cause it to adhere to the moistened grains. These efforts met with no success. Other companies using the process were experiencing similar difficulties with segregation and dusting, and had conducted unsuccessful experiments in an attempt to alleviate these difficulties.

10. In September, 1950, Mrs. Xarifa L. Bean, Director of Research of plaintiff Morris Bean & Co., discovered that the phenol formaldehyde resin could be coated onto sand grains by dissolving the resin in a solvent, such as acetone, adding the resin solution to the sand and mulling the mixture until the solvent fully evaporated. The resulting coated grains were dry, free-flowing and dustless. Although Mrs. Bean reduced the amount of resin to about 4% by weight of the sand and produced coatings of only about one ten-thousandth of an inch around each grain, the resin coated sand upon heating was capable of forming strong foundry molds wherein the sand grains were bonded together at the points of contact of the grains, leaving substantial open interstices between the grains for the escape of gases through the mold. Such resin coated sand has been used commercially by Morris Bean & Co. from about October, 1950 to the present. It has sold almost twelve million dollars worth

of castings made with resin coated sand, most of which castings could not have been made at all without such coated sand.

11. About February, 1951, Schmitt Foundation, owners of Acme Resin Company, commenced a program of research in an attempt to develop a resin coated sand. Experiments were conducted throughout the year 1951 and into 1952. Its chemists added the resin in liquid form and employed heat to "advance" or polymerize the resin in their attempt to produce a coating of solid resin on the grains.

Throughout 1951, the Foundation was unable to achieve a commercially satisfactory resin coated sand. In the 1951 experiments a liquid "one-step" resin[1] had been employed. Beginning early in 1952 a novolak or "two-step" resin[2] was employed. Hexamethylenetetramine (hereinafter "hexa") was added as a hardening agent. When heated, the hexa breaks down into formaldehyde and ammonia, the latter acting as a catalyst for the reaction between the formaldehyde and the excess phenol of the resin, so that the polymerization reaction can proceed to completion, causing the resin to harden or thermoset. The resin, sand, and hexa were mulled in a mulling machine. The mulling of the hot mix was stopped when the reaction of the resin and hexa had proceeded to the point where the softening point, or the "stick point," of the resin (as measured on a metal bar heated at one end) was in the range from 80° to 102° C. With the sand thus coated, Fitko and Horn were able to produce good shell molds, and good castings from the molds with the use of much less resin than used in the Croning process. The July 5, 1952, application, upon which patent '188 was issued, followed these experiments.

12. In subsequent experimentation, Fitko found that during the mulling operation, as the resin advanced through a tacky stage, considerable strain was imposed on the muller. In an attempt to reduce this strain by adding to the mix a lubricating material, such as Acrawax, a high melting point synthetic wax, he discovered that the addition of certain proportions of this waxy material greatly increased the strength of the shell molds. He attributed this result to his belief that the waxy material had formed an outer coating around the resin coated sand, increasing the flowability of the grains and accordingly the density of packing of the grains when they were dropped onto the heated pattern. Several other high melting point waxy materials, such as calcium stearate, produced similar results. The June 5, 1953, application, upon which patent '163 was issued, followed these experiments.

13. Resin coated sand had a number of significant advantages over the Croning process. Of particular significance was the saving in the cost of resin. The amount of resin required was reduced from a range of about 6% to 8% by weight of the sand to a range of 2½% to 4½%, a saving of as much as one-half in the cost of the resin, which represented a major portion of the total expense involved. At Ford's Dearborn Specialty Foundry alone, this resulted in a saving of approximately half a million dollars annually, based upon the 1953 volume, when the Croning process was used in casting only a few of the many parts required by Ford. At General Motors' Saginaw and Danville foundries alone, the savings in resin costs ran as high as $800,000 per year.

The several problems referred to in Finding 8 were met. "Dusting," and the resulting fire and explosion hazards, were virtually eliminated, and dermatitis was completely avoided. The resin coated sand could be handled in automatic machinery without segregation. Cores could be blown with coated sand, thus making it possible to eliminate not only

---

1. Resins containing sufficient formaldehyde for complete reaction with phenol. Such resins are hardened and thermoset merely by the application of heat.

2. A resin having a molar deficiency of formaldehyde, so that it cannot thermoset until a hardening agent is added.

the Croning process but also the baked oil process used in producing cores, thereby permitting foundries to standardize their processes and to greatly reduce the cost and improve the quality of the cores. Surface finish of the castings was improved, reducing the amount of machining required and the percentage of scrap.

The use of resin coated sand has substantially supplanted the use of the Croning process.

14. Schmitt Foundation initially attempted to license its patents to the foundry industry. However, the foundries resisted taking a direct license, suggesting that it instead concentrate its licensing efforts on the manufacturers.

By 1961, Schmitt had succeeded in licensing several of the larger resin suppliers either to make and sell resin coated sand or to sell resin with a sublicense to use it for coating sand.

15. When the Bean patent No. 2,991,-267 in suit issued, containing claims of basic scope on resin coated sand, the officials of Schmitt investigated and concluded that these claims were valid and dominated the Schmitt patents, so that its licensees would also require a license under the Bean patents.

Schmitt Foundation and Morris Bean & Co. accordingly decided to enter into a joint licensing program, making their patents collectively available to all in the foundry industry for a reasonable royalty.

16. All of the significant U. S. suppliers of the special phenol formaldehyde resin used in resin coated sand, with the exception of Reichhold Chemicals, Inc., have taken licenses under the patents in suit, and nearly one-half million dollars in royalties has been paid under these licenses.

### Validity

17. In its lists of prior art, defendant cited a total of 57 items (39 patents and 18 publications), and at the trial introduced in evidence 39 items (24 patents, 13 publications and 2 abandoned patent applications). Most of the prior patents were applied against all four of the patents in suit.

18. None of the prior patents or publications relied upon by defendant discloses or suggests any of the inventions claimed in the Bean '267 and '823, and Fitko '188 patents. The prior patents which are most relevant to the broad inventions of these patents are those in the abrasives art, which disclose the use of phenol formaldehyde resins on abrasive grains for the purpose of forming grinding wheels and other bonded abrasive articles.

The more relevant of these prior patents are:

a. Martin U.S. patent No. 1,626,246 which discloses a method of making abrasive articles and involves wetting abrasive grains with about 3% by weight of furfural, a resin-forming solvent. 7% to 15% by weight of powdered resin is then added with the objective of causing it to adhere to the moistened grains. To form a grinding wheel, the coated grains are pressed in a mold under a pressure of 900 pounds per square inch, then removed from the mold and baked 15 hours at 350° F.

The coated grains are slightly tacky so that they can be pressed together in the desired shape and will hold this shape after removal from the mold for baking. They are not dry and free-flowing within the meaning of the patents in suit, and cannot be stored without caking, but must be used within a few hours after mixing. Any appreciable handling causes the powdered resin to separate from the grains. Tests showed that the process by which sand grains are coated in the manner disclosed by this patent is not capable of making usable shell molds, even though the lower content of 7% of resin taught in the patent is used.

b. Novotny U.S. patent No. 1,901,325 which discloses a method of treating abrasive grains by heating the grains to a temperature of 180° to 200° F., and mixing with the heated grains 5% by weight of powdered resin with the objective of causing the powdered resin to

melt and coat the grains. The treated grains are then wet with 0.2% to 5% by weight of a liquid resin, and 12% by weight of a powdered resin is added with the objective of causing the powdered resin to adhere to the moistened grains. The grains are then placed in a mold and cold pressed to the desired form, removed from the mold and baked. This method differs considerably from those disclosed in the patents in suit.

The abandoned Novotny U.S. patent application, Serial No. 382,583, discloses a simplified process in which the abrasive grains are pre-heated to 250° to 300° F. and mixed with 14% by weight of solid resin with the objective of causing the resin to melt and coat the grains. The coated grains are intended to be placed in a mold and formed to the desired shape by either applying a compacting pressure of 500 to 2,000 pounds per square inch, or by tamping, jarring or rolling. The formed article is then removed from the mold and baked from 5 to 52 hours at temperatures increasing from 175° to 350° or 390° F.

In actual commercial use, and confirmed by tests in which 5% by weight of powdered resin was used, it was found that this process caused the resin to advance or polymerize and become sticky so that it was not possible to obtain a thin, uniform coating. The resin coating was also brittle, so that handling caused the resin to break off of the grains. Moreover, the resin was so far advanced that it was no longer capable of softening and flowing sufficiently to form a strong bond between the grains, and was "useless for commercial purposes."

c. Martin and Upper U.S. patent No. 2,010,873 which discloses a process that commences with abrasive grains coated with powdered resin by the process disclosed in either the Martin patent No. 1,626,246 or the Robie patent No. 2,076,-517 and modifies the coating by spreading out the grains in a single layer on a metal pan or moving metal belt and heating them at a temperature of 350° F. for 2½ minutes, with the objective of caus-ing the powdered resin to fuse into a solid, homogeneous film which is said to be hard, dry and non-tacky. This process was used commercially to a limited extent during the middle 1930's by the patent owner, The Carborundum Company, but was discontinued because of its expensiveness.

The time required to heat the abrasive grains on a moving belt through a heating oven was such as to render of questioned practicality the use of the process in making grinding wheels. The process would be wholly impractical for use in foundry molding where very large volumes of coated grains are required and where these grains do not form part of the product which is sold but are consumed and discarded and merely represent manufacturing overhead cost. Tests indicated that only poor shells can be made and that the coated grains caked on standing.

d. Robie U.S. patent No. 2,076,517 which discloses a process similar to that of the Martin patent 1,626,246 except that the abrasive grains are wet with about 2% by weight of a liquid resin before about 7% by weight of powdered resin is added.

This process and that of the Martin '246 patent have been for many years and still are the principal commercial methods of making bonded abrasive articles. The coated grains produced by this patent have all of the characteristics of those produced by Martin '246, including tackiness, lack of storage stability and tendency for segregation of the resin from the grains. Tests showed that sand coated by this process with 4%, 9% and 14% resin made poor molds and rough castings.

e. Benner & Melton U.S. patent No. 2,092,903 which discloses a process of coating abrasive grains with various types of bonding materials including glues, varnishes, lacquers and synthetic resins by dissolving the bonding material in a solvent, immersing the grains to be coated in the solution and either spraying the solution and grains out of a nozzle or extruding them through an orifice

900

and using jets of gas to break up the emerging stream. It is intended that the solvent will evaporate during the interval the grains are falling to the floor or other surface below, to leave the grains coated with solid, dry films of the bonding material.

The patent does not disclose any relative proportions of binder, solvent and grain, nor the structure of the spraying or extruding apparatus, etc. Thus it does not contain sufficient teaching to insure a successful coating operation.

Records of The Carborundum Company show that those who experimented with the process encountered various difficulties including the fact that considerable amounts of the resin were sprayed free of the grains rather than being attached to the grains. Tests conducted by plaintiffs in the present litigation, under the conditions described in the Carborundum records, showed that the coating did not have time to dry while falling from even a height of 15 feet, and the grains clumped badly when collected. Carborundum never used the process commercially, and it is apparently impractical for commercial use.

f. Martin & Upper U.S. patent No. 2,114,229 which discloses a method that commences with abrasive grains coated with powdered resin by either the Martin '246 process or the Robie '517 process. These grains are spread out on pans in a layer about 1 inch thick and aged from 10 to 48 hours at temperatures from 60° to 108° F. and at low humidity, with the objective of causing the powdered resin to coalesce into a solid, homogeneous film.

Because of the considerable handling involved and the resulting high cost, the process was of limited commercial practicality for the preparation of abrasive grains employed in the manufacture of grinding wheels. It would be impractical for preparing the much larger volume of resin coated sand consumed and discarded in shell molding operations. Tests by both parties showed that the grains coated in the manner disclosed, though subjected to an added mulling operation

following the aging step, still caked on standing.

Tests by plaintiffs, using sand coated with 4%, 7% and 14% resin, showed that shell molds made by this method were unusable. Defendant was able to produce shells by the unusual procedure of dumping a Croning-type mix of sand and dry, powdered resin over a layer of the resin coated sand on the hot pattern to form a bonded back-up layer before inverting the pattern. The castings produced in these shells were not commercially acceptable.

19. There are a number of substantial differences between the materials, techniques and objectives of the abrasives art and those of the shell molding art, including the following:

a. In making bonded abrasive articles, sharp-edged grains produced by crushing fused aluminum oxide or silicon carbide are preferred and are used almost exclusively. Such grains are also used in making high quality "sandpaper" and other coated abrasives. Sand is not used except in the cheapest grade of sandpaper.

In foundry molds, round grained sands are preferred, and used, except where the higher cost of round grains dictates the use of sub-angular grains (having rounded corners between angularly disposed faces).

b. In resin-bonded grinding wheels, the normal range of resin content is 8% to 14% by weight of the grains. Over 99% of bonded abrasives have resin contents in the range of 6% to 17%. In resin-coated foundry sands, the typical range of resin content is 3% to 4½% by weight of the sand. While certain types of bonded articles made with abrasive grains, such as rubbing blocks and filter plates, use binder percentages as low as 4% or 5%, such articles are not ordinarily made with resin binder, but with vitrified clay binder.

c. In making grinding wheels, the grains and bonding material are always compacted under pressure, usually very high pressure, in a mold. This requires

grains which are "pressure sensitive" or slightly tacky. Then the formed article is removed from the mold and baked for a number of hours. In shell molding, the coated grains are either dropped against a heated pattern or blown into a heated core box, are subjected to only very light pressure, such as the force of gravity, and the only heat supplied is that which is transmitted from the pattern or core through the mass of grains during a minute or less before the pattern or core is inverted.

d. The end uses of an abrasive article and a foundry mold are entirely different. A foundry mold must withstand the pressure of the hot, molten metal for a sufficient period to permit the metal to solidify, then the resin binder must disintegrate to permit separation of the mold from the casting; no such requirements exist in the use of abrasive articles.

20. Because of these and other differences between the abrasives art and the foundry art, the existence of the patents and publications in the abrasives art cited by defendant did not render Bean '267 and '823 and Fitko '188 inventions obvious to persons of ordinary skill in the art.

21. The tests performed by both parties in the present litigation showed that if anyone had attempted to employ the methods disclosed in the abrasives art to produce resin-coated grains for foundry molds, even with changes in the types and sizes of grains and the percentages of resin used, he would not have been able to produce shell molds which could have been used to make commercially acceptable castings.

22. In addition to the aforementioned patents, defendant also relied upon an abandoned patent application Serial No. 215,906 of Henby and McIlvaine of National Engineering Company. That application disclosed dissolving a phenol formaldehyde resin in methanol and mixing it at room temperature with sand, in a ratio of 4½% of resin solids by weight of sand, until the methanol evaporates.

The application asserted that a dry, free-flowing resin coated sand is produced. In actual use it was found that the methanol evaporates so slowly and incompletely at room temperature that the resin coating usually does not become fully dry and non-tacky.

This patent application was not filed until March 16, 1951, three months after the filing on December 4, 1950 of Mrs. Bean's patent application for patent No. 2,991,267 in suit. The first experimental work of Henby and McIlvaine was not done until January 4, 1951. Since pending patent applications are held in secrecy by the Patent Office, this application was never publicly available.

23. Defendant also relied upon the experimental work of J. E. McMillan of Monsanto Company as being prior to Bean '267. McMillan's only notebook records of actual experimental work show that he was attempting to increase the green strength of binders for grinding wheels. The only batch which he claimed to have mixed to "dryness" was the one which subsequent tests showed to have the highest green strength or tackiness. Such a material was not dry, hard and free-flowing within the meaning of the patents in suit. There was no attempt to use this material to make shell molds or any other bonded articles.

24. None of the prior patents or publications cited by defendant teaches the partial reaction of a novolak resin with hexamethylenetetramine during the process of coating a granular material, to yield a coated material having a stick point in the range of 80° C. to 102° C., as claimed in the Fitko et al. patent No. 2,-706,188 in suit.

This range of stick points is significant in shell molding. If the stick point is substantially below 80° C., the coated sand cakes on standing in hot, humid weather; if the stick point is substantially higher than 102° C., the resin will be so far advanced that it will not soften and flow sufficiently to cause the coatings of adjacent granules to bond to-

902

gether, and thus will not form a shell of acceptable strength.[2a]

*Validity of the Fitko '163 patent*

25. At the time of the filing of the application for the Fitko '163 patent, June 5, 1953, resin coated sand was known and used as a molding composition. Prior thereto, the public literature had disclosed and described the addition of wax, e. g., metallic soaps such as calcium stearate, and other lubricants to molding compositions to act as a mold release agent; as a plasticizing agent; and as a lubricant. Wax was, in fact, a well-known mold release agent, a well-known plasticizing agent, and also a well-known lubricant in plastic molding compositions.

26. The Fitko '163 patent itself states that the purpose of adding wax to resin coated sand is that the wax acts "as a lubricant or release agent when the coated sand is applied to a metal pattern," and that it also acts to achieve a "reduction in power consumption for a given quality of sand being handled in a mixer." The patent then states "the combination of the unctuous material with the particles of resin coated sand results in other advantages, such as improved strength of the shell molds and better density."

27. The inventor Fitko, in making his "invention," had recognized that in preparing resin coated sand, there was a considerable strain imposed on the muller. To solve his problem, he needed, for his requirements, a lubricant or wax having certain physical properties. He asked a wax salesman from Glyco Products, Inc. for a wax having these physical properties, and the salesman said, "That sounds like our Acrawax C," and the salesman sent a sample of Acrawax to Fitko. Fitko tried it; it worked. He admitted that he fully expected it to work not only as a plasticizing agent, but also as a mold release agent, and as a lubricant.

28. Fitko stated in his patent that he added wax to the resin coated sand for the purpose of obtaining mold release, resin plasticity, free-flowing particles and reduced power consumption in the muller. He admitted that he obtained and expected all of these advantages.

29. After having added the wax and after having achieved all these expected results, the patentee then ascertained that he had unexpectedly obtained the additional advantage noted in the patent, namely, increased tensile strength and greater density or packing of the material, and that this unexpected result came about because the wax acted as a lubricant, causing the particles to slide with respect to each other and thus pack more densely. The ability of wax to act in this manner was known in the art, and should also have been expected.

30. At the time of the Fitko '163 application, the prior art revealed that it was known to add wax as a mold release agent, a lubricant, and as a plasticizing agent. For example, in:

Principles of High-Polymer Theory and Practice, by Schmidt and Marlies (1948), p. 319, Section 806, "Lubricants are used to prevent molded pieces from sticking to the mold."

The Chemistry of Synthetic Resins, by Ellis (1935), Vol. II, p. 1276, "The tendency of molding compositions to stick to the mold may be best overcome by the inclusion of a lubricant * * * Stearic acid, stearates, and metallic soaps [3] are extensively used for such purposes."; and p. 1328, "An effective method is to grind the metallic soap with the otherwise finished molding composition in such a manner that each particle becomes coated with the finely ground lubricant."

British Patent No. 532,952, issued February 4, 1941, although relating to abrasive articles, taught that "The addition, in small amounts, of a lubricant such as calcium stearate, to the mix is also of assistance in avoiding sticking."

2a. As to prior art considered by the Patent Office, see Conclusion of Law 3, footnote 5.

3. Calcium stearate is a metallic soap.

Novotny Patent No. 1,901,325 taught that "china wood oil, dibutyl phthalate, metallic soaps, and oleates such as oleic acid" could be used as plasticizers.

Commercial Waxes, Natural and Synthetic, edited by H. Bennett (1944), p. 331, states under "Plastic Molding * * (1) The wax, in a plastic composition, lubricates the surface and reduces the tendency of the plastic to stick to the mold[4]; (2) it lubricates the particles of the compound in themselves, thus reducing the friction and, consequently, increasing the effective plasticity of the molding material during its plastic stage in the mold. * * * "

31. The subject matter of the Fitko '163 patent is a resin coated sand molding composition to which wax has been added, the wax, as described in the claims, being in the form of an "outermost enveloping film," an "all enveloping film" or "completely enveloped by an * * * outer film layer" of wax on the surface of the resin coated sand particles.

32. Whether the patent covers a complete continuous outer film of wax or whether it covers a product where wax is distributed over the surface of the resin coated molding material, the evidence warrants the finding that the state of the art was such that it would have been obvious to add a wax or lubricant to coat the surface of the particles of a molding composition used in a "shell molding" process. The discovery of the result of the increased strength of the mold flowed naturally "from teachings of the prior art."

*Infringement*

33. Stockham has made resin coated sand for use in core blowing machines since about 1961, and makes and uses twenty to thirty 500-pound batches of resin coated sand daily. The process of resin coating employed by it was developed with the advice and assistance of sales representatives of Reichhold Chemicals, Inc.

34. There are two basic types of processes performed by defendant in making the accused resin coated sand. One of these, which employs the resin in liquid solution, includes the following steps:

a. 500 pounds of sand, either Hardy B–2 sub-angular sand or M–100 round sand, are pre-heated to a temperature of approximately 245° F. and charged into a pug mill.

b. 26 pounds of Reichhold type 192–9M liquid phenol formaldehyde resin (comprising 67% to 69% of resin solids dissolved in methanol) is added to the pug mill and mixed for about one minute.

c. When the temperature of the mix is approximately 215° F., approximately 3 quarts of an aqueous solution of hexamethylenetetramine (formed by mixing 80 pounds of hexa with 15 gallons of water) is added, causing the temperature to drop to approximately 200° F.

d. Mixing is continued for approximately 1¾ to 2 minutes, at which time the mix begins to "ball" up in the mill. About 4% to 5% of powdered calcium stearate based on the weight of resin is then added.

e. Mixing is continued for approximately 2 minutes, and the coated sand is dumped onto a vibrating screen which breaks down any lumps and reduces the mass to individual grains.

The stick point of the resulting resin coated sand, as measured on a conventional metal test bar heated at one end, is about 215° F. (101.6° C.).

The other Stockham process is similar except that:

a. The sand is pre-heated to a higher temperature of approximately 375° F. and a solid, flaked Reichhold type 7520 phenol formaldehyde resin is added.

b. After mixing for about 1½ minutes, quench water is added to reduce the temperature of the mix to about 200°–225° F., at which time the hexa solution is added.

---

4. Mold release.

35. Claims 1, 2, 3, 5, 6, 8, 9, 10, 11 and 16 of the Bean patent No. 2,991,267 are in suit. Claim 1, which is the broadest of these claims, reads as follows:

"1. A dry, free-flowing, self-bonding, granular composition for forming into foundry casting molds and the like while in said dry and free-flowing state and consisting of individually coated sand granules, the coatings thereon being dry and non-adhesive films of thermosetting resin binder for adhering said individual granules together upon activation and setting of said binder at the points of contact among said granules into a rigid foundry mold but being dry and non-tacky prior to said activation and setting for maintaining said free-flowing condition of said composition."

The language of this claim is applicable to the products of both of the coating processes employed by defendant.

36. Claim 2 is similar to Claim 1 but adds that the resin films are "non-tacky" and "substantially continuous." The resin coating on defendant's coated sands is non-tacky. It is also substantially continuous as is clearly shown by photomicrographs.

37. Claim 3 is dependent upon Claim 2, adding that the sand grains are "washed," "substantially round" and "finer than 50 mesh." Both the Hardy B–2 and the M–100 sands used by Stockham are "washed" grains of "finer than 50-mesh" grain size. However, only the M–100 grains are "substantially round."

38. Claims 5 and 6 are also dependent upon Claim 2, adding that the amount of the resin binder is respectively substantially "½% to 5%" and "1% to 4%" by weight of the sand. The resin content of the Stockham resin coated sand is approximately 3.6%, and falls within the ranges specified in each of these claims.

39. Claim 8 is likewise dependent upon Claim 2, adding that "the thickness of the binding material coating is approximately 0.0001 inch, whereby adjacent granules * * * substantially touch one another while open interstices

remain therebetween." The resin coating is too thin and too irregular in conformation to permit measurement, its thickness can be computed arithmetically as slightly less than 0.0001 inch. It is thin enough to leave open interstices between the grains.

40. Claim 9 contains the same language as Claim 2, but adds that the thermosetting resin is "in a thermoplastic plastic stage" which means that upon heating, the resin coating initially will soften sufficiently to permit the fusion of the coatings of adjacent granules at their points of contact. The resin coating of the Stockham sand will soften to this extent, for example, when the sand is dropped upon a heated pattern or test bar.

41. Claims 10 and 11 contain the same language as Claims 2 and 9, respectively, but add that the resin is a "phenolic." The resin employed by Stockham is a phenolic, specifically, phenol formaldehyde.

42. Claim 16 is generally similar to Claim 2 but describes the resin as "becoming tacky at elevated temperatures" before setting. The resin coating of the Stockham sand satisfies this description.

43. All of the language of Claims 1, 2, 3, 5, 6, 8, 9, 10, 11 and 16 of patent No. 2,991,267 is literally applicable to the resin coated sand made and used by defendant, with the sole exception that Claim 3, which calls for a round sand, is not applicable to the resin coated sand made with the Hardy B–2 sub-angular sand.

44. The resin coated sand made and used by defendant performs the same function in the same way to accomplish the same result as the resin coated sand disclosed and claimed in patent No. 2,-991,267 and is the full equivalent thereof.

45. Only Claim 1 of Bean patent No. 2,914,823 is in suit. It covers a casting mold made with resin coated sand. The claim reads:

"1. A casting mold the walls of which are composed of grains of sand which have been individually pre-coat-

ed with dry films of thermosetting resin binder adhering to said grains, the binder on adjacent grains being bonded together and thermoset around the points of contact and the films between said contact points being so thin as to leave substantial open interstices for escape of gases through said mold."

46. In the specification of the '823 patent, at Page 1, Column 1, line 43 et seq., the term "molds" is defined as including " * * * cores, which are here considered a type of mold. * * *"

47. All of the language of Claim 1 is literally applicable to the cores made by defendant using resin coated sand.

48. Claims 7 and 8 of Fitko et al. patent No. 2,706,188 were sued upon. Both claims are directed to a resin coated sand made with a two-step or novolak phenol formaldehyde resin partially reacted with hexamethylenetetramine to produce a "melting" point (i. e., stick point) in the range of 80° to 102° C. Plaintiffs are no longer pressing Claim 7, since it covers only "normally liquid" resin, not used by the defendant.

49. Claim 8 reads that "each sand particle is coated with about 2–4% by weight of a film of a potentially thermosetting resin * * *" It omits the use of the words "normally liquid" as applied to the resin employed and as used in Claims 1 through 7; nevertheless, the patent is plainly limited to the use of "normally liquid" resin. It does not mention any other type of resin to be employed. The specifications teach that:

"[I]t is particularly advantageous to employ *the liquid resin material* more particularly described and claimed in the copending application of Chester W. Fitko, Serial No. 297,394 filed of even date herewith. More specifically, said resin composition is composed of an acid-catalyzed pheno-formaldehyde resin which is normally permanently fusible; is *normally liquid,* i. e. in liquid condition as formed and employed * * *" Col. 2, 11. 23–30 (Emphasis supplied)

"During this heating the volatiles are removed from the *initially liquid resin* * * *" Col. 2, 11. 61–62 (Emphasis supplied)

" * * * [D]esirably good flow is obtained by the practice of the coating process described, as distinguished from the prior practice of directly employing a dry mix, *or as distinguished from the employment of an initially solid resin dissolved in a solvent* even though it may be of the class which is made with a molar deficiency of formaldehyde, or the employment of the latter solution *or even the liquid resin of the present invention* * * *" Col. 3, 11. 10–17 (Emphasis supplied)

50. Co-inventor Fitko admitted that Fitko '188 contribution was limited to "normally liquid" resins, and co-inventor Horn considered the subject matter of the invention as avoiding the use of solid resins. The Patent Office file history of the patent distinguishes the use of its "normally liquid" resin from solid resin. In a later filed application (346,534— April 2, 1953) covering a "normally solid" resin, Fitko and Horn stated that its copending application No. 297,396, upon which '188 was issued, employed a "normally liquid" resin. The temperature limitations of 80–102° C. in the claims of Fitko '188 are applicable only to normally liquid resins. When the '188 application was filed, the inventors had never worked with solid resins. Their employer, Acme Resin Corporation, was without facilities for the production of solid resins. When it acquired such facilities, it no longer needed to use the process of the '188 patent and its use was abandoned.

51. The '188 patent is limited to "normally liquid" resins. Reichhold 192–9M resin, which is employed by the defendant in liquid form in one of its processes, is actually a normally solid Reichhold type 7520 resin dissolved in methanol. In the other process defendant uses a solid, flake Reichhold type 7520. As stated in Finding 48, defendant does not use "normally liquid" resins, and the resin coated sand made by it does

not fall within Claim 8 of Fitko '188 as concedely is the case as to Claim 7.[4a]

52. Plaintiffs have not used the patents to exclude competition, but have made them available for licensing collectively to all foundries and all manufacturers of foundry resins at a maximum royalty of $\frac{3}{8}$¢ per pound, which represents only about $1\frac{1}{2}$% of the current market price of the resin. The evidence does not show that plaintiffs have ever refused an offer from a prospective licensee to take a license under less than all of the group of patents. It shows that Union Carbide Corporation has two separate licenses, one of which covers only the patents of Schmitt Foundation, and that Union Carbide currently pays royalties under that license only.

53. Most of plaintiffs' licenses have been granted to manufacturers of the resin rather than to foundries, although the patents do not cover the resin itself but resin coated sand and foundry molds made therewith. The resin in question is not a staple commodity of commerce suitable for substantial noninfringing use, but is especially formulated for use in making resin coated sand as claimed in the patents. The resin manufacturers sell it for this specific end-use, their sales literature describing and their sales representatives even demonstrating to foundry purchasers the process of the coating of sand with such resins. Plaintiffs made a boda fide attempt to license foundries directly and obtained at least one active foundry licensee. They directed their licensing efforts at resin manufacturers only at the insistence of the foundries.

54. Plaintiffs' licenses provide for reasonable royalties which are on a sliding scale and which permit a reduced royalty rate at higher levels of resin sales. Only the two largest manufacturers of licensed resin, Hooker Chemical Corporation and Acme Resin Co. currently have sales large enough to obtain the benefit of this sliding scale. The roy-alty rates are not discriminatory, since all licensees enjoy the same royalty rates on the same volume of sales.

55. Hooker urged plaintiffs to persuade another licensee, Monsanto Company, to discontinue its policy of dual pricing—that is, publishing a price list showing two prices for its foundry resin, one without a license under the patents, and another (higher than the first by the amount of the royalty) which includes a license. Monsanto actually did discontinue this policy thereafter, and, like Hooker and other licensees, has paid a royalty on resin sales to foundries except where the foundry expressly stated that it did not want a license, in which event the resin price is reduced by the amount of the royalty. Although this requires an affirmative act on the part of the foundry to avoid paying the cost of the royalty, this is reasonable in view of the fact that the resin is especially formulated and recommended for resin coating of foundry sand.

56. The activities of the plaintiffs in their licensing of the patents do not amount to a misuse rendering the patents unenforceable.

57. Every Finding of Fact deemed a Conclusion of Law is hereby adopted as a Conclusion of Law.

## CONCLUSIONS OF LAW

From the foregoing Findings of Fact the Court concludes as follows:

1. This Court has jurisdiction of the parties and of the subject matter of this action.

2. Plaintiffs are the owners of the patents in suit.

3. Claims 1, 2, 3, 5, 6, 8, 9, 10, 11 and 16 of the Bean patent No. 2,991,-267; Claim 1 of Bean patent No. 2,914,-823, and Fitko-Horn patent No. 2,706,188 are valid.

Every patent is presumed to be valid. Title 35 U.S.C.A. § 282. The burden to make good the defense of in-

---

4a. See Appendix for finding of infringement as to No. 2,706,163, if patent be finally held valid.

validity is a heavy one, and every reasonable doubt should be resolved against the party setting up such defense. Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 676, 81 L.Ed. 983; Samuelson v. Bethlehem Steel Company, 5 Cir., 323 F.2d 944, 947. The presumption of validity is strengthened when the prior art cited by the Patent Office is at least as relevant to the claimed invention as the art relied upon in attacking the patent. Southern States Equipment Corp. v. USCO Power Equipment Corp., 5 Cir., 209 F.2d 111; Arnold Pipe Rentals Co. v. Engineering Enterprises, Inc., 5 Cir., 350 F.2d 885, 890; Jeoffroy Mfg., Inc. v. Graham, 5 Cir., 219 F.2d 511, 519 [5]. The citation of a large number of prior patents and publications is evidence of the weakness of the contentions as to invalidity. Reynolds v. Whitin Mach. Works, 4 Cir., 167 F.2d 78, 83, and cases there cited.

4. The patents described in Conclusion No. 3 were not anticipated by any of the prior patents or publications relied upon by the defendant.

■ 5. The patented inventions described in Conclusion No. 3 were not obvious to persons having ordinary skill in the art. They meet the test of nonobviousness prescribed by Title 35 U.S. C.A. § 103. Obviousness should not be determined by hindsight. Arnold Pipe Rentals Co. v. Engineering Enterprises, Inc., supra; Duo-Flex Corporation v. Building Service Company, 5 Cir., 322 F.2d 94, 96–97, but must be determined by (1) the differences between the prior art, after the scope and content of the latter have been determined, and the claims at issue, and after the level of ordinary skill in the pertinent art is resolved, Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 86 S.Ct. 684, 694, 15 L.Ed.2d 545; and by (2) an evaluation of historical events and conditions, as stated by the court in Graham, 86 S.Ct. 694:

"Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."

or as stated by Judge Hand in Reiner v. I. Leon Co., 2 Cir., 285 F.2d 501, 503–504:

"There are indeed some sign posts: e. g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant?"

Measured by these guidelines and as directed by these "signposts," the Court concludes that these three inventions were not "obvious at the time the (inventions were) made to a person having ordinary skill in the art to which (the) subject matter (of the inventions) pertains." 35 U.S.C.A. § 103. They recognized an unfilled need. Other efforts to overcome the disadvantages of the Croning process were unsuccessful. The prior art failed to teach the solution to the problems of Croning. These inventions have enjoyed very considerable commercial success and have virtually supplanted the Croning process. Generally, the contributions of the inventions have been recognized in the industry to which they pertain, and all of the substantial manufacturers of phenol formaldehyde resins for foundry use, except Reichhold, have taken licenses under the patents.

The fact that others were working so hard to achieve a solution to the problems

5. Some of the more relevant of these are: Aylsworth No. 1,090,439, cited against Bean '267 and Fitko '188; Robie No. 2,-203,321 and Weston No. 2,517,815, cited against both Bean patents and Fitko '188; Grube No. 2,491,006 and Richardson No. 1,508,124, cited against Fitko '188.

presented by Croning emphasized the need for such a solution, confirmed the seriousness of the problems involved in Croning and the difficulty of solution. Such other work under the facts here presented, when submitted to a careful analysis, does not constitute sufficient evidence of independent contemporaneous development as to render these inventions obvious to a person having ordinary skill in the art.

■ 6. Plaintiffs have not misused the patents nor violated antitrust laws in their collective licensing of the patents or otherwise.

■ The combination of complementary patents in a single ownership is not illegal, Baker-Cammack Hosiery Mills, Inc. v. Davis Co., 4 Cir., 181 F.2d 550, 570; International Manufacturing Co. v. Landon, Inc., 9 Cir., 336 F.2d 723; Standard Oil Co. of Indiana v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926, if the combination is not used for improper purposes such as were found in American Securit Co. v. Shatterproof Glass Corp., 3 Cir., 268 F.2d 769, where competing patents were involved.

There was no misuse by the licensing of resin manufacturers rather than foundries. Calhoun v. United States, 168 Ct.Cl. 663, 339 F.2d 665, 668.

■ Sliding scale royalties are recognized and commonplace and do not constitute misuse. See Ellis, Patent Licenses, 3 Ed. § 129.

The payment of royalties by licenses on all sales of sand coating resin to foundries, unless the purchaser states that it does not wish a license (in which event the price of the resin is reduced by the amount of the royalty), was approved in Calhoun v. United States, supra.

■ 7. Claims 1, 3, 4 and 5 of the Fitko patent No. 2,706,163 are invalid. The "invention" was both anticipated by the prior art patents and printed publications and was such as to be ob-

vious at the time of the invention to a person having ordinary skill in the art. It is not invention to select a known compound to meet known requirements. Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644.

■ A patent should not be granted on an obvious act which would naturally flow from the teachings of the prior art even though an unexpected advantage or result was obtained. Zero Manufacturing Co. v. Mississippi Milk Producers Ass'n, 5 Cir., 358 F.2d 853, 855.

■ Obviousness is not determined on the basis of whether there was or was not a new result in a patented combination, Graham v. John Deere Co. of Kansas City, supra, at 4, but whether or not it was obvious to combine the materials in the first place. See also, General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43; Floridin Co. v. Attapulgus Clay Co., 3 Cir., 125 F.2d 669, 671, and LaMaur, Inc. v. De Mert & Dougherty, Inc., 265 F.Supp. 961 (N.D.Ill.).

■ 8. Claims 1, 2, 3 [6], 5, 6, 8, 9, 10, 11 and 16 of patent No. 2,991,267, and Claim 1 of patent No. 2,914,823 are infringed by the defendant.

9. Claim 8 of patent No. 2,706,188 is not infringed by the defendant.

■ While it is true that a limitation in claims not in issue may not be used to restrict claims in suit, Baker-Cammack Hosiery Mills, Inc. v. Davis Co., supra, "it is elementary that claims are construed in the light of the description and to cover the real invention found in the specification and drawings." Kinnear-Weed Corp. v. Humble Oil & Refining Co., 5 Cir., 259 F.2d 398, 402. The claim must be interpreted in the light of the patent disclosure. Phillips Petroleum Co. v. Shell Oil Co., 5 Cir., 166 F.2d 384, 386–387. "[A] patentee's broadest claim can be no broader than his actual

---

6. Claim 3 describes the sand grains as "substantially round." The infringement would be applicable only to the M-100

sand and not to the sub-angular Hardy B-2 sand.

invention." Kemart Corp. v. Printing Arts Research Laboratories, Inc., 9 Cir., 201 F.2d 624, 629. See also, Dominion Magnesium Limited v. United States, 162 Ct.Cl. 240, 320 F.2d 388, 394; Huntman Stabilizer Corp. v. General Motors Corp., 3 Cir., 144 F.2d 963, 967. "[N]o claims are to be read in abstractu." Clark v. Wright Aeronautical Corporation, 2 Cir., 162 F.2d 960. The teachings of the specifications of the invention concern the use of "normally liquid" resins only, and the use of such resins "is distinguished from the employment of an initially solid resin dissolved in a solvent." Otherwise, the words "initially solid resins" are not employed. The use of "normally liquid" resin may fairly be construed as a basic teaching of the patent. See Fritz W. Glitsch & Sons, Inc. v. Wyatt Metal & Boiler Works, 5 Cir., 224 F.2d 331, 335, footnote 7, where it was said:

> "True, the claims of the patent define and measure the invention, and they contain no express limitation as to the use of stainless steel in the patented structure, but we think Glitsch significantly fails to mention any other lightweight, flexible, and noncorrosive metal so readily adaptable and commercially feasible for bubble tray use so that, irrespective of the broad language of the claims, the use of stainless steel in a bubble tray structure may fairly be construed as a basic teaching of the patent."

 In an infringement suit a person may not take a position inconsistent with the one he maintained before the Patent Office, Straussler v. United States, 154 Ct.Cl. 275, 290 F.2d 827, 830, as where he has changed his position either by amendment or advocation of a limiting construction which would work an implied disclaimer. United States Pipe and Foundry Co. v. James B. Clow & Sons, Inc., (N.D.Ala.) 205 F.Supp. 140, 151. See Finding 50. Stockham did not use a "normally liquid" resin.

 10. An invalid patent cannot be infringed. New Products Corp.

v. Outboard, Marine & Manufacturing Co., 7 Cir., 263 F.2d 521. But if patent No. 2,706,163 be finally held valid, it is infringed as found in the Supplemental Finding of Fact set out in the Appendix.

11. Every Conclusion of Law deemed a Finding of Fact is adopted as a Finding of Fact.

12. Plaintiff Morris Bean & Company, a corporation, is entitled to the following relief:

 (1) An injunction under Title 35 U.S.C.A. § 283 against the defendant enjoining further infringement, direct or contributory, of each of Claims 1, 2, 3, 5, 6, 8, 9, 10, 11 and 16 of patent No. 2,-991,267, and Claim 1 of patent No. 2,-914,823.

(2) An accounting, pending which, and under the authority of E-I-M Company v. Philadelphia Gear Works, Inc., 5 Cir., 223 F.2d 36, the Court withholds a determination as to whether the infringement has been willful and deliberate and whether on account thereof the plaintiff is entitled to a multiple award of damages under Title 35 U.S.C.A. § 284, and attorney's fees under Section 285. Jurisdiction as to both matters is specifically reserved.

 (3) Three-fourths of the costs will be taxed against the defendant, and one-fourth against the plaintiff Schmitt.

Counsel will submit an appropriate form of judgment for the Court's consideration.

## APPENDIX
## SUPPLEMENTAL FINDINGS OF FACT

51 a. Claims 1, 3, 4 and 5 of patent No. 2,706,163, which are in suit, in general terms are directed to a resin coated sand having an outer layer of waxy material, which the specification discloses as functioning to increase the strength of the shell molds formed with the sand.

Claim 3 is in most respects the broadest claim. It reads:

> "3. Free-flowing, storage-stable particles of sand individually coated

with from about 2 to 4% by weight of a solid, nontacky layer of potentially thermosetting resin, said resin layer carrying an outermost enveloping film of solid nontacky heat liquefiable waxy material having a melting point at least substantially that of the resin coating on the sand and substantially insoluble therein in solid condition and in the proportion of from about 0.5 to 8% by weight of the resin."

The calcium stearate employed by defendant in its resin coating process is a heat liquefiable waxy material. It increases the strength of the shells formed with the coated sand. Claim 3 does not require that the waxy material be in the form of a continuous, lacquer-like coating and is fully compatible with the discrete, particulate condition. It does not require that the calcium stearate layer cover the entire surface of the grains. A test conducted without pressure (as distinguished from defendant's test under 2000 pounds psi pressure) applied to the mixture of resin and calcium stearate indicated substantial insolubility of the stearate in both the liquid and the solid resin.

b. Claim 1 is similar to Claim 3, but omits the description of the outer film of waxy material as "enveloping" and describes the resin coating and the waxy material as forming a "blended dual layer"; it further describes the resin coated sand as "dustless." The term "blended dual layer" means that there is not a sharp demarcation between the outer layer of waxy material and the inner layer of resin but instead that the two layers blend into one another, with a greater concentration of waxy material on the outside and a greater concentration of resin on the inside. The dustlessness of defendant's resin coated sand was shown both by pouring tests and by screen analyses.

c. Claim 4 is the same as Claim 3 in describing the resin layer as carrying the waxy material as "an outermost enveloping film" but adds that the resin coated sand particles are "discrete" and that the resin is "normally thermoplastic" and is a "phenol formaldehyde * * * including and partially reacted with hexamethylenetetramine." The particles of defendant's resin coated sand are "discrete." This is shown by screen analyses which established that the coated sand has a particle size distribution not substantially different from that of the uncoated sand.

d. Claim 5 is also similar to Claim 3 but describes the waxy material as forming an "all-enveloping" film, and states that the resin coated sand is "adapted for production of shell molds of increased density and tensile strength," that the waxy material is "adapted to act as a pattern lubricant."

e. Tests of defendant's resin coated sand, with and without the addition of calcium stearate, establish that the stearate increased the flowability of the sand, its density of packing and the strength of the resulting shells to an extent greater than would be expected from the small amount of stearate added (0.18% based on the weight of sand), indicating that the stearate is concentrated at the outer surface of the resin coating and substantially completely envelops the grains. A test involving addition of a dye which stains the calcium stearate, but not the resin nor the sand, confirmed that the stearate forms a complete outer envelope about defendant's resin coated grains.

f. All of the language of Claims 1, 3, 4 and 5 of patent No. 2,706,163 is literally applicable to the resin coated sand made and used by defendant.

g. Defendant's resin coated sand performs the same function in the same way to achieve the same result as that disclosed and claimed in patent No. 2,706,-163 and is the full equivalent thereof.