**KORI CORPORATION and Huey J. Rivet**

v.

**WILCO MARSH BUGGIES AND DRAGLINES, INC., John M. Wilson, Sr., Dean R. Wilson, and Robert J. Wilson, Jr.**

Civ. A. No. 79–3636.

United States District Court, E.D. Louisiana.

Dec. 11, 1981.

On Damages Aug. 30, 1982.

**514**

Thomas S. Keaty, New Orleans, La., for plaintiff.

Nathan Greenberg, Gretna, La., for defendants.

## OPINION

ROBERT F. COLLINS, District Judge.

This case was tried before the Court, sitting without a jury, on February 2, 1981 through February 6, 1981. Oral arguments were heard on February 20, 1981. The case was then taken under submission. After careful consideration of the evidence adduced at trial, the arguments of counsel, the submitted memoranda and materials, the relevant facts and the applicable law, the Court, pursuant to the provisions of Fed.R.Civ.P. 52, hereby makes the following FINDINGS OF FACT AND CONCLUSIONS OF LAW.

### FINDINGS OF FACT

1.

The complaint in this action, filed September 20, 1979, alleges that:

(a) defendant Wilco Marsh Buggies and Draglines, Inc. is making, using, and selling "Amphibious Marsh Crafts" in the Eastern District of Louisiana in infringement of plaintiffs' United States Patent No. 3,842,-785; and

(b) defendant Wilco Marsh Buggies and Draglines, Inc., through defendants, John M. Wilson, Sr., Dean R. Wilson, and Robert J. Wilson, Jr., obtained by unfair business practices confidential information and trade secrets pertaining to the manufacture and wholesale, retail, and use of the "Amphibious Marsh Craft" patented by Rivet U.S. Letters Patent 3,842,785 (hereinafter Rivet '785 patent).

2.

The complaint asks judgment of Seven Million and no/100 Dollars ($7,000,000.00), treble damages and interest, attorneys' fees, all costs and disbursements of the proceedings, all other just and equitable relief, injunctive relief against patent infringement and engaging in unfair trade practices, and a jury trial.

3.

Defendants answer, inter alia that:

(a) the patent in suit is invalid because it was issued in violation of the requirements of 35 U.S.C. §§ 101, 102(a) and 102(b);

(b) defendants do not infringe the patent in suit; and

(c) defendants did not obtain by unfair business practices confidential information and trade secrets belonging to plaintiffs pertaining to the subject matter of the patent in suit.

4.

Defendants counterclaim against plaintiffs alleging the following:

(a) the patent in suit was fraudulently procured in violation of 15 U.S.C. 1 *et seq.;*

(b) by attempting to assert rights under an illegal patent, plaintiffs have violated the anti-trust laws;

(c) the illegal actions of the plaintiffs have damaged defendants in the amount of $1,500,000.00, which defendants ask to be trebled pursuant to the anti-trust laws; and

(d) the allegations of obtaining trade secrets by unfair business practices have libeled defendants and entitled them to damages in accordance with law.

5.

Trial by jury has been waived by plaintiffs and defendants.

### The Parties

6.

Plaintiff Huey J. Rivet is the inventor named in the patent in suit.

7.

Plaintiff Louis Woodson, by written instruments dated January 15, 1978 and November 11, 1979, is named as the exclusive licensee under the patent in suit and the assignee of an undivided one-half interest in the same patent, respectively. Both documents have been recorded in the United States Patent and Trademark Office.

**8.**

Plaintiff Kori Corporation (hereinafter Kori), a Louisiana corporation, is named as a non-exclusive licensee under the patent in suit.

**9.**

Defendant Wilco Marsh Buggies and Draglines, Inc. (hereinafter Wilco) is a Louisiana corporation.

**10.**

Defendants John M. Wilson, Sr., Dean R. Wilson, and Robert J. Wilson, Jr. are the sole shareholders of defendant Wilco.

*The Patent In Suit*

**11.**

The Rivet '785 patent was issued on October 22, 1974 to Huey J. Rivet for an invention entitled "Amphibious Marsh Craft" and will expire October 22, 1991.

**12.**

The Rivet '785 patent concerns an improved pontoon-type endless track vehicle which will work in a swamp environment, carrying heavy loads up to sixty tons over tree stumps and other foreign objects.

**13.**

The patent has never been adjudicated.

**14.**

The patent contains seven claims. Claim 1 describes an amphibious craft comprising: "a pair of space elongated pontoons, each pontoon comprising a primary buoyant closed wall structure, having a top and bottom and having a substantially uniform vertical height over at least half its length measured from rear to front; vertical bulkheads spaced along the length of said pontoons adding rigidity to the pontoon and defining a plurality of separate buoyant chambers within the pontoon; a plurality of spaced I-beams welded to the bottom of the pontoons transversely of the pontoons between said vertical bulkheads over the length of said pontoon; at least two primary channel means on the top and bottom of the pontoon; endless drive chains carried in each of said channel means; channel shaped drive cleats secured to and extending between said chains; plastic support blocks secured to the web of said cleats intermediate the drive chains and positioned to bear against the top and bottom of each pontoon; drive means for driving the endless chains; and I-beam spacer means welded to said pontoons at the top and rigidly interconnecting said pontoons fore and aft in substantially parallel relation."

**15.**

Claims 2 to 5 of the patent in suit depend from claim 1 and contain all of its limitations.

**16.**

In addition to the limitations of claim 1, claim 2 contains further limitation of requiring a: "secondary channel means intermediate said primary channel means on the pontoons running longitudinally along the top and bottom of each pontoon with the flanges directed outwardly, the area between said flanges on the channels being filled with a low coefficient of friction plastic material against which the plastic support blocks on said cleats will bear and slide."

**17.**

In addition to the limitations of claims 1 and 2, claim 3 contains the further limitation of requiring "said plastic support blocks are of a low coefficient of friction plastic."

**18.**

In addition to the limitations of claims 1, 2 and 3, claim 4 contains the further limitation of requiring "endless drive chain sprockets secured to shafts mounted proximate the top of each pontoon in a free floating bearing assembly said endless drive chains meshing with said sprockets and being drivingly connected to said drive means."

**19.**

In addition to the limitations of claims 1, 2, 3 and 4, claim 5 contains the further limitation of requiring that "said drive means is a separate hydraulic motor for driving the endless tracks of each pontoon."

20.

Claim 6 is an independent claim which describes for use with an amphibious craft having a pair of spaced elongated pontoons over which pass endless track propulsion members having channel shaped driving cleats with the side flanges directed away from the pontoons: "an anti-friction load transfer system comprising at least one longitudinal channel member secured to the underside of the pontoon with its flanges directed away from the pontoons, an anti-friction load transfer system comprising at least one longitudinal channel member secured to the underside of the pontoon with its flanges directed away from the pontoon, plastic filler between said flanges, and plastic support blocks secured to the back side of said cleats over the plastic filler in the longitudinal channels on the underside of the pontoons to provide a local bearing surface having a minimum coefficient of friction between the pontoon and driving cleats."

21.

In addition to the limitations of claim 6, claim 7 contains the further limitation of requiring "the plastic filler and plastic blocks are of the group of epoxy, teflon, nylon and polypropylene."

*Background on the Development of Commercial Vehicles for Use in Marsh Lands*

22.

The first amphibious craft of commercial utility in the marshes was patented by Frank Reynolds as U.S. Patent No. 2,546,523, issued August 20, 1947.

23.

In the 1940's and early 1950's, "Reynolds-type" marsh crafts were used solely for seismic work which included light work, such as the carrying of seismic survey crews into the Louisiana marsh in their hunt for oil and gas.

24.

During this same period, Hershal A. "Pug" Morris and Douglas T. Ritchie were among the early commercial users of marsh craft beginning the industry in Louisiana by manufacturing, leasing, and using devices based upon the Reynolds patent.

25.

A marsh craft was first used in pipeline construction in the early 1950's by Ritchie who placed a small dragline on a set of Reynolds-type pontoons and began doing light pipeline work in the treeless Louisiana marsh.

26.

The equipment produced by Ritchie and the equipment of similar marsh craft manufacturers, contractors, and users were restricted solely to the treeless marsh environment, because cyprus and tree stumps were very dangerous for the Reynolds-type marsh craft or "marsh buggies."

27.

None of the crafts manufactured by Ritchie from the 1940's to the early 1970's was capable of working in treed swamp and supporting heavy uppers which are used in pipeline construction.

28.

In about the early 1950's, Ritchie developed a marsh machine. He applied for a patent for that machine, but the patent application was denied.

29.

In attempting to solve the problems posed by stumpy swamp lands, Ritchie built smaller marsh machines and installed a backhoe on his machines. Even these machines, however, were unsuccessful in traversing tree stumped marsh lands.

30.

From the late 1940's, starting with the invention of the Reynolds marsh craft, until the early 1970's, the oil and gas industry sought to devise an effective method for digging a pipeline ditch in a treed swamp region.

31.

During this period, conventional earth moving equipment, such as backhoes, draglines, and the like, were mounted on timber mats and used to dig the pipeline by first clearing away tree stumps.

**32.**

The matting of machines was a highly inefficient means for digging pipeline ditch, since machines had to be matted into the job site and matted out of the job site and could only move from one spot to the next by transferring a mat to the location where the machine was next destined to move.

**33.**

The use of mats was hazardous to both equipment and operator, since the metal bottomed machines would become quite muddy and would often slip off of the mats if not expertly operated.

**34.**

The use of mats supporting conventional equipment was expensive and often resulted in the holding up of a job because mats would become damaged and replacement of these mats often took days or weeks.

**35.**

The use of Reynolds-type marsh craft to dig pipeline right-of-way in even a treeless marsh environment was so hard on these early machines that it was common practice to have two or three times the number of machines that normally would be required as backups when breakdowns occurred.

**36.**

The industry needed an amphibious craft which could operate in a swampy treed environment for long periods of time without excessive damage or breakdown and could support heavy upper machinery such as backhoes, hydraulic tree cutters, draglines and the like.

**37.**

As late as 1971, plaintiff Huey J. Rivet used mat machines on a long pipeline from Collins, Mississippi to Chalmette, Louisiana. When Rivet began to lose money on this job because his matted machines and Reynolds-type amphibious crafts were constantly breaking down, he experimented with the Reynolds craft to create a machine that was capable of working for long periods of time, without excessive repairs, in a tree swamp environment while carrying the heavy uppers used in pipeline construction.

**38.**

Rivet applied for a patent on his "Amphibious Marsh Craft" and on October 22, 1974 he was issued United States Patent No. 3,842,785, which is the subject of this lawsuit. (*See* Findings of Fact No. 14—No. 21, infra, for a more detailed description of the Rivet invention.)

**39.**

The Rivet invention was designed to perform certain functions which no other machine, prior to the Rivet invention, was capable of doing.

**40.**

The Rivet invention was designed to be structurally stronger and having a higher watertight integrity over prior art type amphibious craft, the craft being capable of supporting and carrying into treed swamp environment heavy loads such as draglines, hydraulic tree cutters, backhoes and the like.

**41.**

The Rivet invention was designed to have the ability to support its heavy work load even when walking over tree stumps in a swamp environment, and being further able to resist the torsional or twisting stresses which opened welds of the pontoons of previous craft causing flooding and loss of buoyancy.

**42.**

The Rivet invention was designed to resist bending, buckling, twisting and cracking of the plate weldments. It was designed to allow the vehicle to operate for prolonged periods of time in a treed stump swamp environment without damage to its structure.

**43.**

The Rivet invention was designed as a rugged buoyant structure which could support in water, marsh, land, or in a treed stump environment heavy loads of up to sixty tons, including the mounting on the top of the "lowers," or pontoon structure, heavy duty construction equipment such as draglines, tree cutters, backhoes, and the like.

**44.**

The Rivet invention is structurally superior to the Reynolds marsh craft for three reasons:

(a) vertical bulkheads spaced along the length of the pontoons, adding to the rigidity of the pontoons and creating a plurality of separate buoyant chambers within the pontoon;

(b) a plurality of spaced I-beams welded to the bottom of the pontoons, again adding rigidity to the pontoons; and

(c) plastic support blocks to the web of the cleats to prevent puncture of the pontoons.

**45.**

Ritchie experimented with plastic blocks to support cleats and prevent bending on some light marsh vehicles in about 1970. This experimentation, however, did not solve the problem of working in a tree stump environment, because stumps could still damage the Reynolds-type pontoon construction used by Ritchie.

**46.**

In swamp pipeline construction, there is no longer any need for matting or the use of barges for crossing swamps and canals after the introduction of the Rivet craft.

**47.**

The Rivet Amphibious Marsh Craft was successful in accomplishing its unique objectives, and it proved to be a commercial success as well.

**48.**

Since the licensing of the patent in suit to Louis Woodson and Kori, the commercial success achieved through the use of the patented craft has been maintained by Kori in the digging and backfilling of pipeline right-of-ways through Louisiana swamp land.

*The Patent Infringement*

**49.**

Robert J. Wilson, Sr., father of the three individual defendants, was employed in early 1974 by Rivet as a contract welder.

**50.**

As a contract welder for Rivet, Robert J. Wilson, Sr. received instructions as to the fabrication of pontoons which were the subject at that time of a patent application by Rivet, the application later maturing into the Rivet '785 patent.

**51.**

During his employment by Rivet, Robert J. Wilson, Sr. was shown by Rivet's shop foreman, Pat Madere, the exact construction of the Rivet pontoon construction including assembly details, such as sizing, cutting and placement of I-beams, the spacing and dimensions of bulkheads, the assembly of the pontoons, and the placement of welds.

**52.**

After terminating his employment with Rivet, Robert J. Wilson, Sr. moved and began building a set of pontoons following the format he had learned during his employment by Rivet.

**53.**

In June of 1974, the three individual defendants, John M. Wilson, Sr., Dean R. Wilson and Robert J. Wilson, Jr., incorporated defendant corporation Wilco.

**54.**

In June of 1974, Robert J. Wilson, Sr. began an employment as an independent contractor with the defendants by manufacturing pontoons of the same construction as he learned while being employed by Rivet.

**55.**

After Rivet obtained his patent, and after his amphibious marsh craft had become commercially successful, he was approached by Harold Tassin, Jr., who wanted a Reynolds-type machine renovated using the patented Rivet construction.

**56.**

Tassin paid Rivet royalties of approximately $10,000.00 to add the pontoon structure taught by the patent as well as the support blocks and longitudinal channels.

**57.**

The Tassin machine was subsequently sold in about 1975 to Wilco, which further

taught the defendants the patented construction. When Tassin sold this machine embodying the patented construction to defendants, he told the defendants of the existence of the Rivet patent covering the renovated machine.

58.

Defendant Dean Wilson has, on several occasions prior to the first infringing construction by defendants, indicated his knowledge of the patent. Dean Wilson ordered copies of the Rivet patent and repeatedly indicated his willful intent to infringe the patent notwithstanding consequences.

59.

Defendant Dean Wilson visited plaintiff Louis Woodson in his office in Lafayette, where Dean Wilson informed Woodson that he (Dean Wilson) had obtained copies of the Rivet patent and was building equipment identical to that of plaintiff Kori.

60.

When Woodson raised the infringement of the Rivet patent and the possibility of a license under the patent, Dean Wilson "offered" Woodson a chance to buy him out for approximately One Million and no/100 Dollars ($1,000,000.00).

61.

In September of 1977, Dean Wilson and John Nowlin, General Manager of Kori, met and discussed the patent at the Kori facility, at which time Dean Wilson indicated he had ordered copies of the patent and that he felt the patent was invalid. Nowlin responded that the patent would be enforced.

62.

In early 1978, Madere, a shop foreman for Kori, visited the Wilco facility and saw the construction by Wilco of a machine similar to the Rivet invention, including the placement of transverse I-beams in the bottom of the hull, the spaced bulkheads, the longitudinal channels, the plastic support blocks, and the entire patented combination being included in this manufacture.

63.

In May, 1978, Dean Wilson showed Nowlin the newly manufactured Wilco machine at the Wilco facility in Harvey, Louisiana. The Wilco machine viewed by Nowlin was a substantial copy of the Kori Drott Backhoe machines, having all of the elements of the patented combination and, indeed, being cosmetically identical including an identical paint job.

64.

Following the filing of this patent infringement action against defendants by plaintiffs, defendants have manufactured and sold at least the following amphibious craft constructed in accordance with defendants' shop drawings produced at trial:

| | | |
|---|---|---|
| Bucyrus Erie | Sold to Oceanic Marine Contractors | $240,000 |
| Bucyrus Erie | Sold to Oceanic Marine Contractors | $240,000 |
| Personnel Carrier | Sold to Oceanic Marine Contractors | $ 55,000 |
| Little Giant Marsh Swamp Dragline | | $250,000 |
| Swamp-type Carrier Dragline | Sold to Marine Contractors | $186,000 |
| Bucyrus Erie Backhoe | Sold to Marine Contractors | $250,000 |
| Bucyrus Erie Backhoe | Sold to Marine Contractors | $255,000 |
| Personnel Carrier | Sold to Marine Contractors | $ 50,000 |
| Personnel Carrier | Sold to Marine Contractors | $ 70,000 |

65.

Defendants' structures are equivalent to the Rivet Amphibious Marsh Craft of claims 1 through 5.

66.

In rebuttal, the defendants have attempted to establish the existence of a prior art for various elements or parts of the Rivet '785 patent: United States patent No. 1,161,267 to W.T. Taylor (disclosing an amphibious craft having a pair of elongated pontoons); United States patent to Powell No. 2,223,855 (disclosing reinforcing and strengthening braces); United States patents to MacDonald No. 458,473, Dunn No. 974,779, Chilton No. 1,564,826, Cooper No. 2,375,973, Lanser No. 2,507,913, Anthony

No. 2,547,146, McAleer No. 2,743,694, Greenwood No. 3,304,900, Rainu No. 3,547,062, and Shader No. 3,807,338 (disclosing bulkheads which divide interior of the hull); United States patents to Hayden No. 1,992,-913, Blount No. 2,560,153, Landes No. 3,208,421, Jankins No. 3,215,114, and Lanning No. 3,646,904 (disclosing interconnection of two pontoons by beams extending between the tops of the pontoons); United States patents to Gay No. 1,084,207, Mosca No. 1,230,014, Law No. 2,206,966, Miller No. 1,635,854, Hurthig No. 2,756,830, Gaskins No. 1,822,965, Roebling No. 2,138,207 and Van Slyhe No. 3,131,781 (disclosing two channel means on the top and bottom of pontoons, or the structural and functional equivalent of pontoons with endless chain in each channel); and United States patent to Miller No. 1,635,854 (disclosing drive means for the endless chains).

### 67.

Defendants failed to establish any prior art which disclosed all, or substantially all, of the elements claimed under the Rivet '785 patent.

### 68.

Professor James Gambrell, an expert on patent law, gave his opinion that the Rivet '785 patent complies with all the specifications and claims required by federal law. The Court finds that Professor Gambrell's testimony is credible and convincing.

### 69.

To the extent that these Findings of Fact constitute Conclusions of Law, they are specifically adopted as both FINDINGS OF FACT AND CONCLUSIONS OF LAW.

## CONCLUSIONS OF LAW

### 1.

This is a patent suit brought under the Patent Act, 35 U.S.C. § 1 et seq. (hereinafter the Patent Act). This Court has jurisdiction of the parties and of the subject matter of this action by virtue of 28 U.S.C. §§ 1338, 2201. There is actual controversy between the parties concerning the subject matter of this action, 28 U.S.C. § 2201. Venue is proper as required by 28 U.S.C. § 1400(b).

### 2.

■ The plaintiffs have the burden of proof to establish, by a preponderance of the evidence, that defendants' manufacture, use, and sale of amphibious craft have infringed any on the claims of the Rivet '785 patent. *Moore v. Schultz*, 491 F.2d 294, 298 (10th Cir.), *cert. denied* 419 U.S. 930, 95 S.Ct. 203, 42 L.Ed.2d 161 (1974).

### 3.

The Rivet '785 patent is presumed valid. The burden of establishing invalidity of the patent or any claim thereof shall rest with the defendants. *Radio Corp. of America v. Radio Engineering Lab., Inc.*, 293 U.S. 1, 7, 54 S.Ct. 752, 756, 78 L.Ed. 1453 (1934); *Continental Oil Company v. Cole*, 634 F.2d 188, 195 (5th Cir.1981); *Ingersoll-Rand Co. v. Brunner & Lay, Inc.*, 474 F.2d 491 (5th Cir.1973); *Van Gorp Manufacturing, Inc. v. Townley Industrial Plastics, Inc.*, 464 F.2d 16, 17 (5th Cir.1972).

### 4.

The defendants bear a heavy burden of proof to establish the invalidity or unenforceability of the Rivet '785 patent. The Courts have variously recognized this burden to be akin to the fraud standard of clear and convincing evidence and to the criminal law standard of proof beyond a reasonable doubt, but, at a minimum, greater than a mere preponderance of the evidence. *Ingersoll-Rand Co. v. Brunner & Lay, Inc.*, 474 F.2d 491, 496 (5th Cir.), *cert. denied*, 414 U.S. 865, 94 S.Ct. 125, 38 L.Ed.2d 117 (1973) (citing *Hobbs v. United States Atomic Energy Commission*, 451 F.2d 849 (5th Cir.1971); *Stamicarbon N.V. v. Escambia Chemical Corp.*, 430 F.2d 920 (5th Cir.), *cert. denied*, 400 U.S. 944, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970)).

### 5.

The Patent Act sets forth three conditions of patentability: novelty, utility and non-obviousness. 35 U.S.C. §§ 101–103.

### 6.

■ The Rivet '785 patent satisfies the separate tests of novelty, utility, and non-

obviousness and is valid. *United States v. Adams,* 383 U.S. 39, 48, 86 S.Ct. 708, 712, 15 L.Ed.2d 572 (1966); *Gaddis v. Calgon Corp.,* 506 F.2d 880, 884 (5th Cir.1975).

7.

■ An invention is patentable provided the subject matter sought to be patented and the prior art are such that the subject matter as a whole would not have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject pertains. 35 U.S.C. § 103; *Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 280, 96 S.Ct. 1532, 1536, 47 L.Ed.2d 784 (1976); *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966); *Continental Oil Company v. Cole,* supra.

8.

■ The test of non-obviousness is not whether the individual elements were obvious at the time of the invention but whether the combination as a whole produced a new and different result which was not obvious. *U.S. v. Adams, supra,* 86 S.Ct. at 714–715; *Continental Oil Company v. Cole,* supra at 197.

9.

A combination of elements and parts may result in an effect greater than the sum of the several effects taken separately. Such a synergistic result is strong if not conclusive evidence of non-obviousness. *Van Gorp Manufacturing, Inc. v. Townley Industrial Plastics, Inc., supra* at 20.

10.

The subject matter as a whole, of the invention defined in claims 1 through 7 of the Rivet '785 patent, would not have been obvious at the time the invention was made to one having ordinary skill in the art of amphibious craft.

11.

Claims 1 through 7 of the Rivet '785 patent express the novel concept constituting the invention and such concept is set forth in terms of a combination of elements

and the cooperative physical relationship. The specifications and claims comply with the requirements of 35 U.S.C. § 112.

12.

■ A combination is not rendered unpatentable by the existence of its various elements separately in the prior art. *Bates v. Coe,* 98 U.S. 31, 48, 25 L.Ed. 68 (1878); *Imhaeuser v. Buerk,* 101 U.S. 647, 660, 25 L.Ed. 945 (1880).

13.

■ Anticipation is a technical defense which must meet strict standards. Unless all the same elements are found in substantially the same situation and united in the same way to perform the identical function in a single prior art reference, there is no anticipation. *Continental Oil Company v. Cole, supra* at 195; *Hughes Tool Co. v. Ingersoll-Rand Co.,* 437 F.2d 1106, 1108 (5th Cir.) *cert. denied,* 403 U.S. 918, 91 S.Ct. 2230, 29 L.Ed.2d 696 (1971); *Tights, Inc. v. Acme-McCrary Corp.,* 541 F.2d 1047, 1056 (4th Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976).

14.

None of the prior art, including the Reynolds-type marsh craft, the machines developed by Ritchie, and all the patents cited in Findings of Fact No. 66, combined the same elements of the Rivet '785 patent in substantially the same situation so as to perform the unique functions of the Rivet invention.

15.

The defendants have not shown by clear and convincing evidence that the invention of the patent in suit was anticipated by any prior public use or sale. *Barbed Wire Patent,* 143 U.S. 275, 284, 12 S.Ct. 444, 447, 36 L.Ed. 154 (1892); *Southern Implement Manufacturing Co. v. McLemore,* 350 F.2d 244, 249–50 (5th Cir.1965).

16.

Hence, claims 1 through 7, being all the claims of the Rivet '785 patent are not anticipated by the prior art and are valid.

**17.**

Infringement is the unauthorized making, using, or selling for use or profit of an invention covered by a valid claim of a patent during the life of the patent. 35 U.S.C. § 271.

**18.**

■ Patents are to be liberally construed so as to uphold and not destroy the inventor's rights. *Eibel Process Co. v. Minnesota & Ontario Paper Co.,* 261 U.S. 45, 63, 43 S.Ct. 322, 328, 67 L.Ed. 523 (1923); *Keystone Manufacturing Co. v. Adams,* 151 U.S. 139, 144–145, 14 S.Ct. 295, 297, 38 L.Ed. 103 (1894).

**19.**

■ One form of infringement occurs when an accused device incorporates a teaching literally read. An infringement also occurs when a device appropriates a prior invention by incorporating its innovative concept and, albeit with some modification and change, performs substantially the same function in substantially the same way to achieve substantially the same result. The "doctrine of equivalent" shields the inventor from such abuse. *Continental Oil Co. v. Cole, supra* at 191.

**20.**

The determination of equivalency involves an examination of the scope prior art, the essence or "heart" of the invention disclosed and the step forward the invention offers. *Id.*

**21.**

A patent such as the Rivet '785 patent, an invention which possesses characteristics of novelty and importance so as to mark a distinct step in the art's progress, and offers a viable alternative to the prior art device for the first time, is a pioneer patent, making liberal construction of its breadth under the doctrine of equivalents appropriate. *Id.*

**22.**

■ Minor modification does not avoid infringement. *Graver Manufacturing Co. v. Linde Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950); *Continental Oil Co. v. Cole, supra* at 197.

**23.**

Defendants, by actively inducing infringement of the Rivet '785 patent are liable as infringers. 35 U.S.C. § 271(b).

**24.**

The defendants' device is the equivalent in function and operation of the Rivet '785 patent.

**25.**

■ Reasonable attorneys' fees are awarded in patent infringement actions only in exceptional cases, as where defendant has willfully and deliberately infringed plaintiff's patent, 35 U.S.C. § 285; *Jenn-Air Corp. v. Penn Ventilator Company, Inc.,* 394 F.Supp. 665, 673–74 (E.D.Pa.1975); *Photon, Inc. v. Eltra Corp.,* 308 F.Supp. 133, 146 (N.D.Ill.1969); *Mott Corp. v. Sunflower Industries, Inc.,* 237 F.Supp. 14, 17 (D.Kan. 1964).

**26.**

■ Having copied these essential parts of the patented amphibious craft, knowing the same to be patented and having no good faith belief that the patent is invalid, defendants are willful infringers. *Solex Laboratories, Inc. v. Graham,* 165 F.Supp. 428, 437 (S.D.Cal.1958).

**27.**

■ A belief by defendants of non-infringement or patent invalidity based upon a careless disregard of the facts is not a good faith belief sufficient to negate a conclusion that they have willfully infringed. *Russel Box Co. v. Grant Paper Box Co.,* 203 F.2d 177, 183 (1st Cir.), *cert. denied,* 346 U.S. 821, 74 S.Ct. 37, 98 L.Ed. 347 (1953); *K.W. Ignition Co. v. Temco Electric Motor Co.,* 283 F. 873, 880 (6th Cir.), *cert. denied,* 260 U.S. 746, 43 S.Ct. 247, 67 L.Ed. 493 (1922).

**28.**

Upon a determination of validity, infringement, and enforceability, a patentee

is entitled to an injunction when in accordance with the principles of equity, 35 U.S.C. § 283; *Arthur J. Schmitt Found v. Stockham Values & Fittings, Inc.,* 292 F.Supp. 893 (N.D.Ala.1966), *aff'd,* 404 F.2d 13 (5th Cir.1968), *cert. denied,* 398 U.S. 965, 90 S.Ct. 2177, 26 L.Ed.2d 549 (1970) ... and, in the discretion of the Court in an exceptional case, to an award of reasonable attorneys' fees, 35 U.S.C. § 285; *Livesay Window Co. v. Livesay Industries, Inc.,* 251 F.2d 469 (5th Cir.1958).

29.

The Rivet '785 patent in suit is valid, infringed, and enforceable as to all claims in issue.

30.

Plaintiffs are entitled to an injunction.

31.

Plaintiffs are entitled to recover damages.

32.

Plaintiffs are entitled to recover costs.

33.

Plaintiffs are entitled to an award of reasonable attorneys' fees.

## MEMORANDUM OPINION

### On Damages

Pursuant to the Judgment, dated December 11, 1981, entered in favor of the plaintiffs, Kori Corporation and Huey J. Rivet, and against defendants, Wilco Marsh Buggies and Draglines, Inc., John M. Wilson, Sr., Dean R. Wilson, and Robert J. Wilson, Jr., the above entitled matter came on for a hearing on damages suffered by said plaintiffs as a result of the infringement by said defendants. After careful consideration of the evidence adduced at trial and at the accounting hearing, the arguments of counsel, the submitted memoranda and materials, the relevant facts and the applicable law, the Court will and hereby does render its Opinion on the issue of damages.

In its Opinion dated December 11, 1981, this Court found as a matter of law that the patent issued to plaintiff Huey J. Rivet, United States Patent No. 3,842,785 (herein-

after Rivet '785 patent), was valid (Conclusion of Law No. 16), that the devices manufactured by the defendants infringed upon the Rivet '785 patent as being the equivalent in function and operation of the patent (Conclusion of Law No. 24), and that the defendants, by actively inducing infringement of the Rivet '785 patent, are liable as infringers (Conclusion of Law No. 23). Issues now before the Court concern the pecuniary damages, prejudgment interest, attorneys' fees, and exemplary damages that plaintiffs are entitled to recover.

### Pecuniary Damages

The measure of recovery for patent infringement is founded upon 35 U.S.C. § 284, which provides in pertinent part:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

In this case, plaintiffs seek to recover as damages the profit derived from the sale of six infringing units as well as profits from the rental of other infringing units. The defendants contend that a reasonable royalty is the appropriate measure of damages. In order to resolve the controversy concerning the measure of damages, it is necessary to briefly recapitulate some of the factual background relevant to the issue of damages.

In the course of his association with the oil and gas exploration and development industry, Rivet realized that marsh vehicles, designed in accordance with the now expired Reynolds patent, were grossly inadequate to do heavy pipe laying work in a treed swamp environment. The pontoon structure of the Reynolds-type marsh buggies were often punctured and battered by the hostile treed swamp terrain, resulting in machine breakdowns and necessitating costly backup machinery and parts. Other equipment had to be matted into the job site which was a time-consuming and ineffi-

cient method of moving equipment. In short, pipe layers were attempting to "make do" with marsh equipment which was not designed to do heavy work in a treed swamp environment. Rivet sought to design a machine capable of successfully traversing waterways, marsh lands, and treed swamps. The fruit of his endeavor is set forth in the Rivet '785 patent and without going into any technical detail, the essential elements of the Rivet patent include: 1) increasing the structural integrity of the pontoon; 2) creating separate chambers within the pontoon to limit loss of buoyancy when the pontoon is punctured; 3) using plastic support blocks to prevent puncture of the pontoon. The Rivet invention, like the Reynolds invention, is amphibious and can navigate waterways and marsh lands. The advantage of the Rivet invention is that it is specifically designed to do heavy work in the rugged treed swamp without mats, breakdowns, or serious structural damage. Rivet has granted an exclusive license to Louis Woodson and Kori Corporation to manufacture machines in accordance with the Rivet '785 patent. Kori has the facilities, manpower, and capital financing to manufacture the Rivet craft and, in fact, does manufacture these machines for use and sale primarily on pipe laying projects. Kori does not sell its machines to domestic customers because these purchasers are generally Kori's competitors in the pipe laying business. Instead, Kori bids on pipe laying projects and builds or uses machines on hand for these projects. Kori only rents machines for use domestically; however, it will sell machines for use outside of the United States.

The defendants acquired the Rivet technology through Robert J. Wilson, Sr., father of the individual defendants, who was employed by Rivet as a contract welder and also through the purchase of a machine which had been renovated using the patented Rivet construction. The defendants obtained copies of the Rivet patent and proceeded to build equipment substantially identical to Rivet machines produced by Kori. Since 1977, the defendants have built at least twelve machines which infringe upon the patent.

Under the present statutory rule, plaintiffs are entitled to recover damages in the amount of the pecuniary loss they have suffered as a result of the infringement, and in no case less than a reasonable royalty. *Aro Manufacturing Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 505–07, 84 S.Ct. 1526, 1542–43, 12 L.Ed.2d 457 (1964). Defendants have consistently maintained that damages should only be awarded in the amount of a reasonable royalty. The statutory language and the relevant jurisprudence, however, clearly dictate that a reasonable royalty is only the minimal standard used in computing damages for patent infringement. Generally, the appropriate inquiry in determining the amount of recovery is "how much had the Patent Holder and Licensee suffered by the infringement. And that question [is] primarily: had the Infringer not infringed, what would Patent Holder-Licensee have made?" *Aro Manufacturing Co., Inc. v. Convertible Top Replacement Co., Inc., supra,* at 507, 84 S.Ct. at 1543 (quoting from *Livesay Window Co. v. Livesay Industries, Inc.,* 251 F.2d 469, 471 (5th Cir.1958)). It is only where the patentee-licensee fails to establish any pecuniary loss resulting from infringement that the court may resort to the reasonable royalty standard. *See e.g. Foster v. American Machine & Foundry Co.,* 492 F.2d 1317 (2d Cir.), *cert. denied,* 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974). In effect, the measure of damages should reflect the ability of the patentee-licensee to utilize his patent.

> If the patentee is a manufacturer, he may prove his damages by evidence of lost sales and profits. But if such proof is inadequate, or if he does not himself sell the product, he may nevertheless be injured by the unlicensed practice of his invention. The reasonable royalty which he might lawfully have collected from the infringer if he had been a licensee may then be the measure of damages.

*Zegers v. Zegers, Inc.,* 458 F.2d 726, 730 (7th Cir.), *cert. denied,* 409 U.S. 878, 93 S.Ct. 131, 34 L.Ed.2d 132 (1972).

In the instant matter, the plaintiffs were clearly capable of exploiting commercial value of the Rivet '785 patent. The plaintiffs manufactured machines employing the teachings of the Rivet '785 patent for their own use on domestic pipeline jobs and also sold these machines for use in foreign countries. The infringing units manufactured by the defendant are similar, if not identical, to the types of machines built by the plaintiffs. Moreover, the evidence clearly demonstrates that the plaintiffs and the defendant infringers directly competed for the sale of units in the foreign market. Under these circumstances, the lost profits on the infringing machines sold for use outside of the United States appear to be the appropriate measure of plaintiffs' damages. The rule in the Fifth Circuit, as set forth in the leading case of *Livesay Window Co. v. Livesay Industries, Inc.,* 251 F.2d 469 (5th Cir.1958), is "[i]f in all reasonable probability, the Patent Owner would have made the sales which the Infringer has made, what the Patent Owner in reasonable probability would have netted from the sales denied to him is the measure of his loss, and the Infringer is liable for that." *Id.* at 471–72. *See also Hughes Tool Co. v. G.W. Murphy Industries, Inc.,* 491 F.2d 923, 929 (5th Cir.1973); *Julien v. Gomez & Andre Tractor Repairs, Inc.,* 512 F.Supp. 955, 957 (E.D.La.1981). Thus, plaintiffs are entitled to lost profits if they would have, in all reasonable probability, made the sales of infringing units which the defendants have made. This jurisprudence is consistent with the notion that damage for patent infringement should reflect what the patentee-licensee would have made had the infringer not infringed.

The defendants have urged the Court to follow the Sixth Circuit approach to lost profits. In *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152 (6th Cir. 1978), the Sixth Circuit set forth a four prong test to determine the patentee's entitlement to lost profits:

> To obtain as damages the profits on sales he would have made absent the infringement, i.e., the sales made by the infringer, a patent owner must prove: (1) demand for the patent product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made. 3R. White, *Patent Litigation: Procedure and Tactics* § 9.03[2]. *See, e.g., Bros. Inc. v. W.E. Grace Mfg. Co.,* 320 F.2d 594 at 598, 138 USPQ 357 at 358 (5th Cir.1963) and *Electric Pipe Line, Inc. v. Fluid Systems, Inc.,* 250 F.2d 697, 116 USPQ 25 (2d Cir.1957).

*Id.* at 1153. The four prong test of this recent decision is perhaps somewhat more elaborate than the language employed by Fifth Circuit jurisprudence. Nevertheless, as indicated by the citation of Fifth Circuit case law, there is no substantive distinction between the Sixth Circuit approach to profits as damages and the traditional test whereby the patentee-licensee is entitled to his lost profits on sales made by the infringer if in all reasonable probability the patentee-licensee would have made the sales had the infringer not infringed.

Under either the Fifth Circuit standard or the test of the Sixth Circuit, the plaintiffs have established their right to damages calculated on the basis of profits lost on the defendants' sale of infringing units for use outside of the United States. Applying the Sixth Circuit test for profits, the first issue is the demand for the Rivet '785 patent. This issue is largely uncontested. The oil and gas industry had long sought a machine which could carry heavy uppers into a treed swamp without significant structural damage and without matting. The Rivet '785 patent was designed to answer the challenge of the treed swamp and the substantial sales of units employing the teachings of the Rivet '785 patent prove a demand. *Bros. Inc. v. W.E. Grace Manufacturing Co.,* 320 F.2d 594, 598 (5th Cir. 1963).

After proving a demand, the plaintiffs must, under the Sixth Circuit approach, then demonstrate the absence of acceptable noninfringing substitutes. Here again, all of the credible evidence adduced at trial and at the accounting hearing demonstrates

the lack of a comparable substitute for the Rivet '785 patent. Defendants contend that machinery built by Quality Industries of Thibodaux, Louisiana (hereinafter Quality) is an acceptable substitute for the Rivet '785 patent. There has been no evidence, however, of the specifications or the working capability of the Quality units. The only evidence of the capability of the products built by Quality is a vaguely worded and self-serving sales brochure. (See Wilco Exhibits 3 and 3a.) It is not even clear whether Quality was marketing a comparable swamp machine during the period of infringement at issue in this case. All of the credible testimony concerning units manufactured by Quality is that they are inferior to the Rivet machines. In fact, testimony brought by the defendants concerning sales to J. Ray McDermott for a job in Nigeria clearly demonstrates that the only substitute for the Rivet patented machines was the infringing units built by the defendants. The evidence indicates that McDermott was interested in purchasing machines patented under the Rivet '785 patent from plaintiff Kori because these were the only machines capable of operating effectively in the jungle swamp of Nigeria. McDermott then became concerned that Kori might not be able to make timely delivery of the machines either because of an alleged dispute between Rivet and Woodson, the sole licensee, or because Kori was involved in a major pipe laying job at the time. As a result of this concern about the timeliness of delivery, McDermott decided to purchase machinery from the defendant infringer, Wilco. Regardless of whether McDermott's fears were well founded, the fact remains that when McDermott sought a substitute for the patented Kori product, it turned not to Quality or some other manufacturer of marsh craft, but to the infringer, Wilco. Thus, from a buyer's perspective, the only acceptable substitute for the patented Kori machines were the infringing machines.

Furthermore, if Quality was such a formidable competitor as the defendants would have this Court believe, the Court is at a loss to explain why the sales by the defendants were not similarly affected by the competition from Quality. Addressing this anomalous situation, the Fifth Circuit in *Bros. Inc. v. W.E. Grace Manufacturing Co., supra,* reversed the decision by the district court which had reduced by two-thirds the lost profits awarded by the Master because the district court found that had the infringer not infringed, two-thirds of the machines sold by the infringer would probably have been sold by two competitors. In restoring the Master's award of profits for sales on *all* infringing machines, Judge John R. Brown stated in pertinent part:

> The Master with ample basis found that had not the Infringer sold the machines, the Patentee would. Neither before the trial Court nor here has the Infringer carried the burden of showing that such finding is clearly erroneous. F.R.Civ.P. 53(a), (e)(2). Indeed, the trial Court's approach is a novel and startling one. The substantial sales made prove a demand. As a matter of economics, had the two other concerns waiting in the wings been as formidable as the Judge must have thought, we are unable to see why, on this theory, the Infringer likewise would not have lost out to these competitors. The consequence of the holding is strange. In effect it is that an admitted infringer who has made substantial profits from purloining another's patent is not made to account for his acknowledged acts because had he not poached, another would or, at any rate, sales of similar products would have been made, not by the patent owner, but by others. To avoid such an anomaly, we therefore restore the Master's finding that the Infringer is liable for all of the machines sold by it during the critical period.

*Id.* at 598. Similarly, this Court concludes that the defendants should not be allowed to profit from infringement of the Rivet '785 patent and then avoid pecuniary damages based upon some vague allegation of a comparable substitute.

The third prong of the Sixth Circuit test for pecuniary damages is that the plaintiffs must prove their manufacturing and mar-

keting capability to exploit the demand for the patented product. Once again, the plaintiffs have sustained their burden of proof. The record clearly reflects that the plaintiffs had and still have the facilities, capital investment, and manpower to manufacture machines to meet the demand for the Rivet '785 patent. Plaintiffs actively engaged in the marketing of their product for use outside of the United States and could take machines from their inventory to satisfy such orders. Defendants assert that the sales of units to McDermott for the Nigeria job, discussed above, illustrates at least one set of circumstances where plaintiffs could not timely deliver units for sale. The weight of the evidence, however, indicates that the plaintiffs could have satisfied the McDermott order in a timely fashion. By contrast, the totality of the negotiations for the McDermott order demonstrates vividly how the defendants "poached" sales from the plaintiffs. As stated above, these negotiations attest to the demand for the Rivet '785 patent and the absence of an acceptable noninfringing substitute because McDermott apparently negotiated with only plaintiff Kori and infringer Wilco for this order. Had Wilco not infringed, these sales would have, in all reasonable probability, gone to Kori. Instead, Wilco infringed upon the Rivet '785 patent and thereby unlawfully exploited the demand for the patented product. Under these circumstances, plaintiffs' damages for pecuniary loss are equivalent to Kori's lost profit on the sales made by the defendant infringers. Stripped of all the factual embellishment, defendants apparently contend that because McDermott chose to purchase units from Wilco instead of Kori, Kori was unable to meet McDermott's demand. The Court is convinced that where an infringer and a patentee-licensee compete for the demand created by the patent, it should be reasonably inferred that in the absence of infringement, the patentee-licensee would have made all of the infringer's sales. Since the plaintiffs had the manufacturing and marketing capabilities to exploit the Rivet '785 patent, the Court finds that in all reasonable probability had the defendants not infringed, the plaintiffs would have made the sales on infringing units purchased for use outside of the United States.

Having found that the plaintiffs are entitled to the profit on infringing units sold for foreign use, the remaining issue is the amount of profits the plaintiffs would have made on these sales. The computation of damages for patent infringement involves a subtle judicial function, and the statute allows considerable discretion in awarding damages. *John Zink Co. v. National Burner Co.,* 613 F.2d 547, 559 (5th Cir.1980); *Bros. Inc. v. W.E. Grace Manufacturing Co., supra,* at 599. Recognizing the hypothetical nature in basing damages upon lost profits, Courts have held that patentee-licensee need not prove lost profits with scientific accuracy, though the damages may not be speculative. *Hughes Tool Co. v. G.W. Murphy Industries, Inc., supra* at 929; *Livesay Window Co. v. Livesay Industries, supra,* at 472. In the instant matter, the plaintiffs have based their lost profit upon the profits the defendants made on six infringing units which were sold for use outside of the United States. It is uncontested that these six machines were built in accordance with the plans which this Court has construed as infringing upon the Rivet '785 patent. It is also clear that these machines were sold on the foreign market in direct competition with sales by the plaintiffs and in all reasonable probability the plaintiffs would have made these sales had the defendants not infringed. Plaintiffs' expert, David W. Harvey, C.P.A., Ph.D., calculates the defendants' profits on the six machines at $379,497. (Dr. Harvey's Report, dated April 13, 1982, p. 2 (Exhibit I of Plaintiffs' Post Trial Brief for Damages Hearing.)) Defendants do not dispute these figures but instead challenge the propriety of using their profits to compute plaintiffs' lost profits. The Fifth Circuit has specifically stated that "the profits made by the infringer from his improper use of the infringing device may be the measure of the damages suffered, even though the statute does not prescribe that profits are to be recovered as such." *Graham v. Jeoffroy Mfg., Inc.,* 253

528

F.2d 72, 74 (5th Cir.), *cert. denied,* 358 U.S. 817, 79 S.Ct. 28, 3 L.Ed.2d 59 (1958); *see also Thomson Machinery Co. v. La Rose,* 306 F.Supp. 681 (E.D.La.1969). Decisions from other circuits are in accord with this proposition. *Atlas-Pacific Engineering Co. v. Geo. W. Ashock Co.,* 339 F.2d 288, 290 (9th Cir.1964), *cert. denied,* 382 U.S. 842, 86 S.Ct. 55, 15 L.Ed.2d 83 (1965); *Georgia-Pacific Corp. v. United States Plywood Corp.,* 243 F.Supp. 500, 529 (S.D.N.Y.1965); *Locklin v. Switzer Brothers, Inc.,* 235 F.Supp. 904, 906 (N.D.Cal.1964). Even the opinion which the defendants rely so strongly upon for their proposition that infringers' profits may not be awarded as damages, states, in pertinent part, that "[i]n some situations the infringer's profits may constitute evidence tending to prove the amount of plaintiff's damages ... or be a relevant factor in the calculation of a reasonable royalty." *Zegers v. Zegers, Inc., supra* at 928 (citations and footnote omitted). Considering the overall facts of this case, especially the fact that the infringing machines were literally identical to the plaintiffs' machines, the Court finds that the defendants' profits constitute a reasonable approximation of the damages suffered by plaintiffs.

Plaintiffs seek damages over and above the amount of the defendants' net profits on the sale of the six infringing machines on the grounds that these profits contain an allocation of overhead amounting to $90,766, which includes fixed overhead costs and salaries of the defendant infringers (Testimony of Mr. Jarrell and Report of Dr. Harvey, dated April 13, 1982, pp. 2–3 (Exhibit I in Plaintiffs' Post Trial Brief for Damages Hearing). Mr. Jarrell testified that if the plaintiffs had built these machines for sale, the plaintiffs would have incurred no more than $20,000 additional overhead expenses. Therefore, the plaintiffs seek the net profits on the sale of the six machines, $397,499, plus $70,766 as the difference between the overhead expenses incurred by the defendants and those which would have been incurred by the plaintiffs.

The Court would agree that plaintiffs' damages should be increased by fixed overhead costs and infringers' salaries which the plaintiffs would not have incurred had they manufactured these machines. *See Saf-Gard Products, Inc. v. Service Part, Inc.,* 491 F.Supp. 996, 1008 (D.Ariz.1980) (Fixed overhead costs are not charged against plaintiffs damages, citing numerous authority.); *Graham v. Jeoffroy Mfg., Inc., supra,* at 76 (Infringing salaries must be added to infringing profits to complete plaintiffs' damages.). Plaintiffs, however, have failed to sustain their burden in apportioning those overhead expenses which should not be charged against the plaintiffs, such as fixed overhead costs and infringers' salaries, from other overhead expenses. Mr. Jarrell attempted to make some allocation, stating that Kori would have incurred no more than $20,000 in added overhead to build these six machines. The Court is not convinced by this testimony because the basis for his apportionment is unknown and is not substantiated by any other evidence. On the other hand, it is clear that the plaintiffs would have avoided at least some of the overhead costs expended by the defendants in producing the six infringing machines. Moreover, the individual defendants were paid substantial salaries during the period of infringement which were derived in part from the sale of infringing units. (Plaintiffs' Exhibits 5 through 10) These factors should be included in plaintiffs' damages, even though they cannot be added to lost profits without some credible evidence allocating these figures. Accordingly, the Court will not attempt to add fixed overhead or infringers' salaries to net profits in calculating plaintiffs' pecuniary damages. Instead, the Court will consider these factors in determining whether to impose exemplary damages.

Defendants contend that a reasonable royalty should be employed in this case or at least the lost profits should be proportionately reduced because the Rivet '785 patent concerns only the pontoon structure of these swamp machines, which covers only a fraction of the cost of the entire unit. For example, the heavy uppers, such as draglines, backhoes, and the like, are the most significant cost element of these ma-

chines, equalling approximately 50% of the total cost in building the units. Since the Rivet '785 patent does not affect the heavy uppers, defendants contend that plaintiffs are not entitled to profits on this portion of the machines. The issue here is whether the Court should apply the "entire market value" rule or whether the damages should be limited to the patented part of the unit. "Under this [entire market value] rule, where the patented feature, although a small part of an article, gives the article its entire commercial value, the value of the entire article may be considered in computing damages." *Hughes Tool Co. v. G.W. Murphy Industries, Inc., supra,* at 928 (citations omitted). One recent decision, *Julien v. Gomez & Andre Tractor Repairs, Inc., supra* summarizes the relevant jurisprudence on the entire market value rule:

To resolve the issue requires a determination of whether the "entire market value" rule applies here. The entire market value rule "allows recovery based on the value of an entire mechanism containing several features, even though only one feature is patented, where substantially the entire marketable value of the total mechanism is attributable to the patented feature." *Crosby Steam Gage and Valve Co. v. Consolidated Safety Valve Co.,* 141 U.S. 441, 12 S.Ct. 49, 35 L.Ed. 809 (1891); *Goulds Mfg. Co. v. Cowing,* 105 U.S. 253, 26 L.Ed. 987 (1881); *Paper Converting Mach. Co., Inc. v. FMC Corp.,* 432 F.Supp. 907 (E.D.Wis.1977). As the court stated in *Westinghouse v. Wagner Mfg. Co.,* 225 U.S. 604, 32 S.Ct. 691, 56 L.Ed. 1222 (1912), the rule is tailored for "cases in which plaintiff's patent is only a part of the machine and creates only a part of the profits." The Supreme Court in *Westinghouse, supra,* 32 S.Ct. at 694 stated:

"He must therefore, 'give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented feature, ... or he must show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, as

a marketable article, is properly and legally attributable to the patented feature.'"

In *Paper Converting Mach. Co., Inc. v. FMC Corp., supra,* at 913, the court emphasized:

"The entire market value rule ... merely permits à recognition of the *actual economic value of the patent* under the unusual circumstances in which *market conditions* themselves would prevent an unlicensed and noninfringing seller from making sales in the market for the entire machine, even though only one or more elements are patented." (Emphasis supplied)

And in *Leesona Corp. v. United States* [220 Ct.Cl. 234] 599 F.2d 958 (Ct.Cl.1979), cert. denied, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1980), the Court of Claims stated:

"Under the entire market value rule, it is not the physical joinder or separation of the contested items that determines their inclusion in or exclusion from the compensation base, so much as their *financial and marketing dependence* on the patented item under *standard marketing procedures* for the goods in question." (Emphasis supplied)

The Fifth Circuit Court of Appeals has applied the *Westinghouse* rationale to a case in which the plaintiff's patent covered the entire machine and attributed 60% of the compensation basis to the portion of the machine (plow) found to have infringed plaintiff's patent. *Graham v. Jeoffroy Mfg., supra,* at 77.

*Id.* at 959. In short, the entire market value rule is merely another permutation of the basic question in determining pecuniary damages: namely, what would the patentee-licensee have made had the infringer not infringed? In this case, had the defendants not infringed, plaintiffs would, in all reasonable probability, have sold the infringing units and would have made a profit on the entire units including the non-infringing heavy uppers. Therefore, under these circumstances, the entire market value rule should apply. Defendants rely

heavily upon *Julien v. Gomez & Andre Tractor Repairs, Inc., supra,* where the Court based damages upon the patented sugar cane planter alone and not on the entire vehicle which utilized the planter. In *Julien,* the Court found that unpatented vehicles could be and were used separate and apart from the patented planter. Hence, the utility of the vehicle was not dependent upon the patented upper structure. In the present case, there has been no evidence that the unpatented heavy uppers have been or can be used independently of the patented pontoon structure. Once the unit has been constructed, the heavy uppers are more or less permanently attached to the patented pontoon structure, and these uppers have no real value to a pipeline digger unless they can be effectively transported across swamps, marsh lands and waterways. Considering all of the evidence, the Court concludes that plaintiffs' damages should be based upon the entire market value of the infringing machines.

In summary, then, the Court finds that the defendants' profits on the sale of the six infringing units, $379,497, is a reasonable estimate of plaintiffs' damages resulting from the defendants' sales of infringing units outside of the United States.

Plaintiffs also claim damages on infringing units which the defendants rented for a profit. The defendants continue to own some of the Wilco built infringing units, and the evidence adduced at the accounting hearing demonstrates that the defendants have rented these machines for a total of 4,850 hours. Therefore, plaintiffs seek the profits of these rentals contending that they would have made these rentals had the defendants not infringed. As stated above, the Fifth Circuit has held that damages may be based upon the profits made by the infringer from his improper use of the infringing units. *Graham v. Jeoffroy Mfg., Inc., supra,* at 74. In this instance, the improper use was the renting of infringing units in contravention of the plaintiffs' rights under the Rivet '785 patent and in competition with the plaintiffs' rental business. At least one other court, under similar circumstances, has suggested awarding damages in the amount of infringer's net rental profits. *Atlas-Pacific Engineering Co. v. Geo. W. Ashlock Co., supra,* at 290. Since the Court finds that the plaintiffs would have made these rentals had the defendants not infringed, the plaintiffs are entitled to the lost rental profits.

To calculate these profits, plaintiffs take the total rental hours and multiply this figure by the average hourly rental profit. The total rental hours of the infringing units, 4,850 hours, is not contested. Plaintiffs contend that had they made these rentals they would have made $50 profit per hour, and they further assert that the $50 per hour figure is the industry norm. Estimates of the defendants' profit margin range from $42.969 (Dr. Harvey's Report dated April 13, 1982, p. 9 (Exhibit I of Plaintiffs' Post Trial Brief for Damages Hearing)) to $28.31 (Testimony of John Wilson). The Court finds that the best estimate of plaintiffs' damages for lost rentals should be based upon the lower hourly profit rate of $28.31. This yields a total profit of $137,311.30 for lost rentals, and the Court will use this figure in computing total damages.

In their post trial memorandum, the defendants have attempted to further reduce the damages on the lost rentals alleging that 95% of the time these machines were used in the marsh lands where non-infringing marsh buggies presumably work equally as well as the Rivet machines. Defendants contend that if they infringed upon the Rivet '785 patent at all with regard to rentals, they infringed merely 5% of the total rented hours when the infringing units were used in the swamp. The record is completely void of any evidentiary basis for the kind of apportionment which the defendants have proposed. Even assuming the hourly distribution as alleged by the defendants, the apportionment they seek would not necessarily follow. For example, if a job requires both marsh work and swamp work, only the Rivet machines will be able to do the job because it is the only machine which can do heavy work in the swamp. Consequently, if non-infringing

machines cannot do 5% of a job, they cannot do the job at all. Moreover, while the Court recognizes that there is some overlap in specifications and capabilities between the patented Rivet machines and the non-infringing marsh buggies, the evidence conclusively demonstrates that units employing the Rivet '785 patent are a better product than the non-infringing machines. The pontoon structure of the Rivet machine is stronger, having superior water tight integrity and puncture resistance. Because of its strength, superior buoyant structure, and ability to resist pontoon puncture, the Rivet machine is capable of carrying heavy uppers across the treed swamp terrain without significant damage. Similarly, these same qualities allow the Rivet machine to last longer and work better in marsh lands and waterways than typical marsh craft. Having infringed upon the Rivet '785 patent, the defendants were able to offer their rental customers a better product than the non-infringing marsh buggies and, therefore, benefited at the plaintiffs' expense from these rentals regardless of whether the infringing machines were used in the swamp, in marsh lands, or elsewhere. The Court concludes that the defendants have failed to allege sufficient grounds for warranting an apportionment of the rental damages. The functional overlap between patented units and non-infringing marsh craft will be considered as a mitigating factor in determining whether exemplary damages should be imposed against the defendants.

### Total Pecuniary Damages

The Court finds the defendants liable to the plaintiffs for a total damages, composed of the lost profits on sales and rentals of infringing units, in the amount of $516,808.30.

### Prejudgment Interest

■ Plaintiffs seek prejudgment interest on the grounds that in addition to the lost profits damages sustained, plaintiffs were also denied the use of these profits during the period infringement. (Dr. Harvey's Report, dated April 13, 1981, p. 6 (Exhibit I of Plaintiffs' Post Trial Brief for Damages Hearing.)) In effect, prejudgment interest makes the plaintiffs whole by compensating them for the delay in receiving their lost profits. There is substantial authority for the plaintiffs' position on prejudgment interest. *See Saf-Gard Products, Inc. v. Service Parts, Inc., supra,* at 1010–11 (citing other recent cases). Because the damages in this case are based upon both sales and rentals over a substantial period of time, the computation of prejudgment interest to compensate plaintiffs is necessarily a complicated process, involving assumptions which this Court is not prepared to make. For example, the record is not clear concerning the date from which interest should run as to the lost sales or the lost rentals, whether it should be from the date of the transaction as to each sale or rental, or the date when plaintiffs could have reasonably expected to receive payment on the sale or rental, or some other date. In view of the uncertainty as to the date when the prejudgment interest should begin to run, the Court concludes that prejudgment interest should not be awarded in this case. Nevertheless, plaintiffs should be compensated for the delay in receiving the lost profits owed to them, and, therefore, the Court will consider this factor in determining whether to impose exemplary damages upon the defendants.

### Attorneys Fees and Costs

■ In the previous Opinion of this Court, dated December 11, 1981, the Court held that plaintiffs were entitled to an award of reasonable attorneys' fees and costs (Conclusions of Law Nos. 25, 26, 27, 28, 32, & 33). Plaintiffs seek $137,609.50 in attorneys' fees and $45,415.70 in costs. (See Affidavit of Costs, attached as Exhibit N in Plaintiffs' Post Trial Brief.) The defendants challenge the attorneys' fees sought on the grounds that the time claimed to have been spent in the prosecution of this case, 2,692.2 hours, is grossly excessive.

Plaintiffs' counsel has recently submitted to the Court an itemized billing of his hours.

The Court, however, is not bound by an attorney's time sheet. The statute provides only for reasonable attorneys' fees, and to this end, the Court may rely upon its own knowledge, experience, and expertise in determining the time required to provide adequate legal services. *Johnson v. Georgia Highway Express,* 488 F.2d 714, 717 (5th Cir.1974). This matter has been before the Court for various status conferences, hearings, a trial on the merits, and a trial on damages. Thus, the Court is sufficiently familiar with activities of counsel to determine the time necessary for the prosecution of this action. The Court would agree that 2,632.20 hours is excessive, being the equivalent to one attorney devoting 50 hours a week on this case for over a year. Defense counsel contends that he has spent approximately 350 hours on this matter. The Court recognizes that the burden of proof rests with the plaintiffs, and this is a particularly heavy burden in an action for patent infringement. While the law presumes the validity of a patent, this presumption does not, as a practical matter, relieve the patent holder from the obligation to prove his case. In order to prevail, plaintiffs have had to investigate and convince the Court that they were the holders of a valid patent, that the patent was willfully infringed upon, and that they suffered damages as a result of the infringement. The Court is convinced that the needs of the plaintiffs in successfully enforcing their rights under the Rivet '785 patent were substantially greater than defendants, and this need should be reflected in the time plaintiffs' counsel devoted to this matter. Accordingly, in view of all factors, the Court finds that an attorney fee of $50,000 to be reasonable in this case, based upon 1,000 hours expended at a rate of $50.00 per hour. With respect to costs, the Court agrees with the defendants that $17,372.49 in costs claimed by the plaintiffs have not been itemized and should not be included in an award for costs. The Court finds that all other costs sought by plaintiffs are reasonable. Wherefore, the Court will award costs in the amount of $28,943.51.

### Exemplary Damages

Finally, the patent code provides for exemplary damages in that the Court "may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. This provision allows the trial court considerable discretion to award exemplary damages based upon the degree of bad faith exhibited by the defendant infringer. *Saginaw Products Corp. v. Eastern Airlines, Inc., supra* at 1143; *Julien v. Gomez & Andre Tractor Repairs, Inc., supra* at 960. The Court has already found that the defendants willfully and deliberately infringed upon the Rivet '785 patent, having copied the essential parts of the patented amphibious craft, knowing the same to be patented and having no good faith belief that the patent is invalid. (Conclusions of Law No. 26) Under these circumstances, where the defendants' conduct was intentional, willful, and with reckless disregard of plaintiffs' patent rights, plaintiffs are entitled to exemplary damages. *See Milgo Electronics v. United Business Communications, Inc.,* 623 F.2d 645 (10th Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980). Moreover, exemplary damages are appropriate because the Court has determined that the defendants' conduct warranted an award for reasonable attorneys' fees. *See Saginaw Products Corp. v. Eastern Airlines, Inc., supra* at 1143. Defendants respond by asserting that they did not in bad faith infringe upon the Rivet '785 patent because they acted upon advice of counsel. *Maloney-Crawford Tank Corp. v. Sander Tank, Inc.,* 511 F.2d 10, 14 (10th Cir.1975); *Julien v. Gomez & Andre Tractor Repairs, Inc., supra* at 960. Once again, the defendants' contention fails for want of evidentiary support. There has been no testimony in this case demonstrating that the defendants sought the advice of a qualified patent attorney before infringing upon the Rivet '785 patent. The evidence before the Court indicates that the defendants willfully and deliberately copied the Rivet '785 patent without soliciting advice of counsel. The advice of a qualified patent attorney was apparently only sought

after defendants had begun to manufacture infringer units and after plaintiffs brought this suit to enforce the Rivet '785 patent. In the Court's opinion, the defendants had decided to market infringing machines without regard to authoritative legal advice and with reckless disregard for plaintiffs' rights under the Rivet '785 patent. Having failed to establish good faith reliance upon an authoritative opinion of invalidity, the defendants' deliberate and willful infringement of the Rivet '785 patent cannot be condoned. Given these circumstances, the Court is inclined to exercise its discretion in awarding exemplary damages.

In determining the amount of exemplary damages, the Court will consider the following factors. First, the pecuniary damages awarded so far have not been sufficient to fully compensate plaintiffs. As noted earlier, the Court held that plaintiffs were entitled to at least some portion of the defendants' fixed overhead expenses and salaries paid to the individual defendants, but there was insufficient evidence to conservatively apportion these elements of the damages. Similarly, the Court was unable to compute prejudgment interest even though the Court found that such interest would compensate the plaintiffs for the delay in receiving their lost profits. All of these factors, the fixed overhead expenses, salaries of individual defendants, and prejudgment interest, should be included in an award of exemplary damages.

The Court also recognizes that the defendants' liability goes beyond the pecuniary damages awarded in this case. Damages have been based upon sales of infringing units for foreign use and upon rentals. The evidence has also shown that defendants sold infringing machines for domestic use. Plaintiffs have not sought lost profits on these machines because they do not sell units for domestic use. While plaintiffs may not have suffered any direct pecuniary loss as a result of the defendants' domestic sales, nevertheless, the plaintiffs have been affected by these domestic sales to the extent that other companies use the infringing units to bid against the plaintiffs for domestic pipe laying jobs. Though plain-

tiffs may recover directly against the domestic users for infringement of the Rivet '785 patent, some responsibility lies with the defendants who manufactured and sold these infringing units. Accordingly, the exemplary damages will take into account the defendants' responsibility for damages resulting from the domestic sale and use of infringing units.

There are only two mitigating factors to be considered with regard to exemplary damages. First is the functional overlap between the Rivet '785 patent and the prior art. The Rivet machine and non-infringing marsh craft can both cross marsh land and waterways, although the Rivet machine is a superior overall product, especially for carrying heavy uppers. The uniqueness of the Rivet '785 patent lies in its ability to carry heavy uppers into the treed swamp. The Court has awarded lost profits on the entire machines because a substantial portion of the commercial value of the Rivet machine is attributable to the patented elements. To some extent, however, the value of the Rivet machine can be imputed to the prior art, and, therefore, exemplary damages should be fixed in consideration of the value of the prior art. The other mitigating factor is the financial ability of the defendants to satisfy a judgment including exemplary damages. While the Court has sought to fully compensate plaintiffs by disgorging profits which were unlawfully purloined by the defendants, the judgment in this matter should not unduly prejudice the defendants' non-infringing business.

In view of all these factors, the Court will double the pecuniary damages awarded for lost profit on the sales and rentals of infringing units. This brings the total damages, excluding the award for reasonable attorneys' fees, to $1,033,616.60.

### Conclusion

The Court finds the following: 1) plaintiffs are entitled to pecuniary damages in the amount of $516,808.30; 2) the award for pecuniary damages should be doubled, increasing the amount of damages to $1,033,-

616.60; and 3) plaintiffs are entitled to an award for reasonable attorneys' fees and costs in the amount of $78,043.51.

Accordingly, the Court will enter judgment in favor of the plaintiffs and against the defendants in the amount of $1,113,-660.11.